STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

Rayshun D. EASON, Defendant-Respondent.

Supreme Court

*No. 98–2595–CR. Oral argument April 12, 2001.—Decided July 9, 2001.*

## 2001 WI 98

(Also reported in 629 N.W.2d 625.)

208

212

For the plaintiff-appellant-petitioner the cause was argued by *Stephen W. Kleinmaier*, assistant attorney general, with whom on the briefs was *James E. Doyle*, attorney general.

For the defendant-respondent there was a brief and oral argument by *Suzanne Hagopian*, assistant state public defender.

An amicus curiae brief was filed by *Howard B. Eisenberg*, Milwaukee, on behalf of the Wisconsin Association of Criminal Defense Lawyers.

¶ 1. N. PATRICK CROOKS, J. This case concerns a no-knock search warrant that authorized police officers to enter an apartment without knocking on the door and announcing their presence. When the police officers executed the search warrant, they found Defendant-Respondent Rayshun D. Eason (Eason) running down a hallway toward the kitchen. After apprehending him, they found a baggie of crack cocaine in the hallway through which Eason had run. The State charged Eason with possession of cocaine with intent to deliver. Eason moved to suppress the cocaine as evidence. The circuit court granted the motion to suppress and the court of appeals affirmed. *State v. Eason*, 2000 WI App 73, 234 Wis. 2d 396, 610 N.W.2d 208. Both the circuit court and the court of appeals concluded that the affidavit submitted in support of the search warrant did not justify authorizing a no-knock entry. This court agrees. Although this is a close case, the evidence presented in the affidavit is not sufficient to establish the requisite reasonable suspicion that knocking and announcing would be dangerous, futile or inhibit the effective investigation of a crime by allowing for the destruction of evidence.

¶ 2. However, we conclude that the evidence should not be suppressed even though the no-knock portion of the warrant was invalid. Although the exclusionary rule typically operates to exclude evidence

obtained from unreasonable searches and seizures—and a search based upon an invalid search warrant is per se unreasonable—there are exceptions. Here, because the police officers acted in objectively reasonable reliance upon the search warrant, which had been issued by a detached and neutral magistrate, the laudable purpose of the exclusionary rule—deterring police from making illegal searches and seizures—would not be furthered by applying the exclusionary rule. Accordingly, we recognize a good faith exception to the exclusionary rule.

¶ 3. We hold that the good faith exception applies where the State has shown, objectively, that the police officers reasonably relied upon a warrant issued by an independent magistrate. The burden is upon the State to also show that the process used in obtaining the search warrant included a significant investigation and a review by either a police officer trained and knowledgeable in the requirements of probable cause and reasonable suspicion, or a knowledgeable government attorney. We hold that this process is required by Article I, Section 11 of the Wisconsin Constitution, in addition to those protections afforded by the good faith exception as recognized by the United States Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984). Accordingly, we reverse the court of appeals decision that affirmed the circuit court's order suppressing the evidence, and remand the case to the circuit court for further proceedings.

I

¶ 4. On April 27, 1998, City of Beloit Police Officer John Fahrney prepared an affidavit in support of a request for a search warrant with a no-knock entry:

WHEREAS, John Fahrney, being first duly sworn, on oath has this day complained in writing to said court upon oath. . .[t]he facts tending to establish the grounds for issuing a Search Warrant are as follows:

1.) Your affiant. . .states he is familiar with the confidential files kept by the Beloit Police Department Special Operations Bureau and as a result knows that the Beloit Police Department has received 2 pieces of intelligence indicating that Clinton Bentley is a drug dealer.

a.) Within the past seventy two hours your affiant met with a reliable confidential informant at a pre arranged location. Upon meeting with this reliable confidential informant your affiant searched the reliable confidential informant for controlled substances and U.S. currency and found none. Your affiant provided this reliable confidential informant with less than $100.00 in U.S. currency so the reliable confidential informant could purchase a quantity of cocaine from Clinton Bentley. Your affiant then observed the reliable confidential informant travel directly to 802 Bluff St Apt B. Your affiant also observed the reliable confidential informant leave 802 Bluff St and travel directly back to another prearranged location. Once at this prearranged location the reliable confidential informant gave your affiant a quantity of suspected cocaine that he/she had purchased from Clinton Bentley. The reliable confidential informant was again searched for controlled substances and U.S. currency and again none was found.

Your affiant then went to the Beloit Police Department and tested a sample of the suspected cocaine using the cobalt thiocyanate field test and in doing so your affiant received a positive test for the prescence [sic] of cocaine. The cocaine was then

placed into evidence at the Beloit Police Department.

2.) Your affiant did a subscriber check for the residence at 802 Bluff St Apt B through WP&L and learned that Shannon Eason has been responsible for the utilities since October 1997.

3.) Your affiant checked Beloit Police computer records which indicate that Clinton Bentley resides at 802 Bluff St. Clinton Bentley was arrested in April 1998 and listed 802 Bluff St as his residence.

4.) Your affiant has checked the criminal histories of both Clinton Bentley and Shannon Eason and in doing so has learned that BENTLEY was arrested by the Belviere Illinois Police Department in 1989 for AGGRAVATED ASSAULT. Your affiant also learned that EASON has been arrested for such things as larceny (nine times), Obstructing (three times), and ASSAULT (twice).

5). Your affiant has been a police officer since 1990 and has participated in approximately 70 drug raids. Your affiant is assigned to the Special Operation Bureau and my duties are to investigate complaints of drug trafficking, gang involvement, and other quality of life issues.

Your affiant is a K–9 officer and has had specialized training in narcotic detection using the K–9. This training was received at North Central Canine Institute in 1992 and has received updated training on a yearly basis.

Your affiant has also been involved in the investigations of other serious criminal offenses including, but not limited to, aggravated batteries, burglaries, robberies, sexual assaults, thefts and child abuse offenses.

Your affiant knows through training and experience that short term traffic where controlled

substances are transported to and from a drug dealers residence is common and that often times drug dealers who don't reside there are present, arrive or are leaving at the time we execute our search warrants. These drug dealers often have vehicles to transport them that are not owned by them or registered to them. Affiant, based on his training and experience with others in that field believes that where illegal drugs are sold by one person, they are purchased by others and commonly carried on the persons of both. It is also true of locations where drug use takes place, persons commonly carry illegal drugs on their body.

Based on affiant's training, experience and associations with others in those fields, he is aware that persons involved in many illegal activities, including drug related crimes often arm themselves with weapons, including firearms and sometimes use those weapons against the police and others. These persons will also destroy or conceal evidence if given time. Affiant, based on the stated experience, training and association, is aware that a very important factor in controlling persons and in particular, during drug raids, is surprise and speed. Affiant is also aware that control reduces the likelihood of injury to all involved. Affiant is aware that announcement eliminates surprise and provides persons within a residence time to take actions that would require a reaction by officers. For these reasons affiant requests that a NO KNOCK search warrant be issued.

(Fahrney Aff. at 4–7.) Based on the information contained in the affidavit, Rock County Court Commissioner Stephen D. Meyer issued a search warrant, which included authorization for a no-knock

218

entry. The warrant was issued at approximately 2:50 p.m. on April 27, 1998.[1]

¶ 5. On May 1, 1998, Beloit police officers executed the search warrant at the location specified therein, 802 Bluff Street, Unit B, an apartment in Beloit. The officers executed the search warrant, proceeding into the apartment by breaking the door in. Upon entering the apartment, the officers found Eason, his aunt, Shannon Eason, Clinton Bentley, three other adults and two small children located within the apartment. Officer Fahrney observed Eason and Shannon Eason running out of the living room down a short hallway towards the kitchen. Officers James Kumlien and John McMahon apprehended Eason and Shannon Eason in the kitchen. Officer Kumlien then found cocaine on the floor of the hallway that Eason and Shannon Eason ran through, although he did not see anyone drop or throw the cocaine on the floor.

¶ 6. The State charged Eason with possession of cocaine with intent to deliver, while within 1000 feet of a school or park, in violation of Wis. Stat. §§ 961.41(1m)(cm)1 and 961.49 (1997–98).[2] Eason moved to exclude the evidence of cocaine, claiming that the search violated his rights under the United States and Wisconsin Constitutions. Eason attacked only that part of the search warrant that authorized a no-knock entry, arguing that the affidavit supporting the warrant failed to allege any specific information that

---

[1] Officer Fahrney endorsed his receipt of the search warrant on April 27, 1998. However, the typewritten date on the warrant is April 28, 1998. Since Officer Fahrney signed that he received the warrant on April 27, we accept that date as the correct date.

[2] All subsequent references to the Wisconsin Statutes are to the 1997–98 version unless otherwise indicated.

anyone in the apartment possessed weapons, or would destroy evidence, if the officers knocked and announced their presence.[3]

¶ 7. The Rock County Circuit Court, Judge Edwin C. Dahlberg presiding, granted Eason's motion to suppress. The court reviewed the search warrant, including Officer Fahrney's affidavit, and concluded that the "affidavit for [the] search warrant fails to allege the requisite reasonable suspicion to justify the issuance of a no knock search warrant." Findings and Order, September 4, 1998. The court also declined to apply the good-faith exception to the exclusionary rule because this court had not yet adopted that exception; correspondingly, the court suppressed all of the evidence obtained during the execution of the search warrant. *Id.*[4]

¶ 8. The court of appeals independently reviewed the affidavit and affirmed. *Eason*, 2000 WI App 73, ¶ 8. The court of appeals agreed that the affidavit did not sufficiently indicate that knocking and announcing would have been dangerous to the officers. The court of appeals also rejected the State's argument that arrests

---

[3] The State raised the argument at the suppression hearing that Eason might not have standing to challenge the no-knock entry. (Mot. Hr'g at 10.) The circuit court indicated that an evidentiary hearing would be needed to determine the standing issue. (Mot. Hr'g at 12.) There is nothing in the record to indicate the hearing took place. However, the standing issue is now moot given the court's conclusion that a good faith exception to the exclusionary rule applies here.

[4] After the circuit court ruled that the evidence should be suppressed, the State moved to stay the proceedings pending appeal. Eason opposed the stay. The record contains nothing further on whether the stay was granted or any other information regarding the procedural status of the case.

listed in the affidavit reflected the apartment occupants' willingness to use violence.

> There is no information as to when and where those arrests took place, or whether they involved any violent acts—and, again, whether a conviction followed. The affidavit doesn't assert that either Bentley or Shannon Eason—or any of the other occupants of the apartment—were armed; it merely offers a general statement that drug-related crimes often involve weapons.

*Id.* The court of appeals rejected the State's alternative argument that there was no causal relationship between the no-knock entry and the discovery of the evidence. *Id.* at ¶¶ 9–10. The court of appeals also refused to recognize a good-faith exception, stating that such an exception would result in overruling the exclusionary rule stated by this court in *Hoyer v. State,* 180 Wis. 407, 193 N.W. 89 (1923). *Id.* at ¶ 13. The court of appeals acknowledged that if *Hoyer* is to be overruled, only this court could do so. *Id.* (citing *State v. DeSmidt,* 151 Wis. 2d 324, 333, 444 N.W.2d 420 (Ct. App. 1989), *overruled on other grounds,* 155 Wis. 2d 119, 454 N.W.2d 780 (1990)). The State petitioned this court for review, which we granted.

## II

■

¶ 9. In reviewing a motion to suppress, we apply a two-step standard of review. *State v. Pallone,* 2000 WI 77, ¶ 27, 236 Wis. 2d 162, 613 N.W.2d 568 (citing *State v. Martwick,* 2000 WI 5, ¶¶ 16–18, 231 Wis. 2d 801, 604 N.W.2d 552). First, we review the circuit court's findings of historical fact, and will uphold them unless they are clearly erroneous. *Pallone,* 2000 WI 77,

¶ 27 (citing *Martwick*, 2000 WI 5, ¶ 18). Second, we review the application of constitutional principles to those facts *de novo. Id.*

¶ 10. Here, the focus of the review is the search warrant's authorization of a no-knock entry. The parties do not dispute that there was probable cause to support that portion of the warrant authorizing the search for evidence of cocaine and other controlled substances. Instead, they dispute whether there was sufficient evidence which would give rise to a reasonable suspicion that knocking and announcing would have been dangerous or would have inhibited the effective investigation of the crime by allowing for the destruction of evidence. *See Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). This inquiry involves review of the search warrant, including the affidavit in support thereof. We recognize that the reasonableness of the police officers' decision to effectuate a no-knock entry is usually evaluated as of the time of entry. *Id.* at 395. The review is limited in scope here, because there is nothing in the record that indicates that the police officers had any other information which would have justified a no-knock entry at the time of executing the warrant that was not included in the affidavit submitted for the search warrant. *See Leon*, 468 U.S. at 923 n.24; *cf. State v. Henderson*, 2001 WI 97, ¶ 30, 245 Wis. 2d 345, 629 N.W.2d 613 (determining the validity of a no-knock execution of a search warrant depends upon the circumstances existing at the time of entry). Consequently, we review only the affidavit and the warrant.

¶ 11. Similarly, both the circuit court and the court of appeals looked only to the search warrant and affidavit to determine whether there was reasonable

suspicion to support a no-knock entry. The circuit court did not make findings of historical fact. Accordingly, we have before us a question of the application of constitutional principles—that is, whether there was sufficient information in the affidavit to establish reasonable suspicion. *See Martwick*, 2000 WI 5, ¶ 17. This question the court reviews independently of the conclusions of the circuit court and the court of appeals. *Id.* at ¶ 18.

## III

¶ 12. The State, Eason, and the amicus, Wisconsin Association of Criminal Defense Lawyers, have made a number of arguments in this case. According to the State, the arrest records of Clinton Bentley and Shannon Eason sufficiently establish that knocking and announcing would have been dangerous to the police who executed the warrant, even though the arrest records do not contain any evidence of convictions. Also, Shannon Eason's arrest for obstruction demonstrates that she could interfere with the investigation of a crime. Besides the arrest records, Officer Fahrney's training and prior experience justified a no-knock entry. Officer Fahrney stated in his affidavit that persons involved with drug-related crimes will often destroy evidence, if given the opportunity. Furthermore, the officers were searching for cocaine, a substance that can easily and quickly be destroyed.

¶ 13. The State also contends that even if this court determines that there was not reasonable suspicion to justify the no-knock entry, there are two reasons why the evidence still should not be suppressed. First, there was no causal connection between the no-knock entry and the discovery of the cocaine, because the evidence was found during the execution of an otherwise valid search warrant. Second, the evi-

dence should be admitted because the officers who executed the warrant acted in good faith reliance on the portion of the warrant that authorized the no-knock entry.

¶ 14. In response, Eason argues that the no-knock entry violated his constitutional rights because the officers did not have reasonable suspicion that knocking and announcing would have been dangerous, that is, that the officers would face armed resistance. According to Eason, the arrest records of Clinton Bentley and Shannon Eason are vague, and not sufficiently particularized. The affidavit does not include any specific facts relating to the arrests for assault and obstruction, or indicate whether these arrests actually led to convictions. Nothing in the affidavit suggests that either Clinton Bentley or Shannon Eason possessed weapons or had used weapons against the police. Similarly, there is no particularized information that anyone in the apartment would destroy evidence or had destroyed evidence in the past. Eason also contends that the information in the affidavit is stale and outdated.

¶ 15. Eason additionally argues that we should not adopt the State's causal relationship test because suppression is the only method to protect the constitutional right against unconstitutional searches. Along a similar vein, Eason and the amicus contend that a good faith exception to the exclusionary rule would effectively abrogate that rule. We will address these arguments as we consider whether the affidavit in support of the search warrant sufficiently established reasonable suspicion, and whether we should adopt a good faith exception to the exclusionary rule or the State's causal relationship test.

## IV

¶ 16. We turn first to the question of whether the affidavit submitted for the search warrant contained sufficient information to establish the requisite reasonable suspicion which would make a no-knock entry reasonable. Both the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution protect against unreasonable searches and seizures.[5]

¶ 17. One requirement of a reasonable search is that police officers executing a search warrant follow the rule of announcement. *State v. Ward*, 2000 WI 3, ¶ 40, 231 Wis. 2d 723, 604 N.W.2d 517 (citing *Wilson v. Arkansas*, 514 U.S. 927 (1995)).[6] The rule of announce-

---

[5] The Fourth Amendment to the United States Constitution states:

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, Section 11 of the Wisconsin Constitution states:

> [t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

[6] As shown later herein, we ordinarily follow the United States Supreme Court's interpretation of the Fourth Amendment when interpreting Article I, Section 11 of the Wisconsin Constitution. *State v. Griffith*, 2000 WI 72, ¶ 24 n.10, 236 Wis. 2d 48; 613 N.W.2d 72.

ment " 'requires the police to do three things before forcibly entering a home to execute a search warrant: 1) announce their identity; 2) announce their purpose; and 3) wait for either the occupants to refuse their admittance or. . .allow the occupants time to open the door.' " *State v. Meyer*, 216 Wis. 2d 729, 734 n.4, 576 N.W.2d 260 (1998) (quoting *State v. Stevens*, 181 Wis. 2d 410, 423, 511 N.W.2d 591 (1994)). The rule of announcement fulfills three purposes: "1) protecting the safety of police officers and others; 2) protecting the limited privacy interests of the occupants of the premises to be searched; and 3) preventing the physical destruction of property." *Meyer*, 216 Wis. 2d at 734 n.4 (citing *State v. Williams*, 168 Wis. 2d 970, 981–82, 485 N.W.2d 42 (1992), *overruled on other grounds*, *Stevens*, 181 Wis. 2d at 430).

¶ 18. The rule of announcement is not inflexible. *Richards v. Wisconsin*, 520 U.S. at 387. The police may dispense with the rule to serve countervailing law enforcement interests. *Id.* (citing *Wilson*, 514 U.S. at 934). In order to dispense with the rule of announcement, "the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. at 394; *see also Meyer*, 216 Wis. 2d at 755.

¶ 19. Although it is not possible to state precisely what the term reasonable suspicion means, it is a "commonsense nontechnical conception(s) that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal

technicians, act.' " *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (citations omitted). What is certain is that reasonable suspicion is "a less demanding standard than probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). The information necessary to establish reasonable suspicion can be less in both content and reliability than the information needed to establish probable cause. *Id.* In other words, the required showing of reasonable suspicion is low, and depends upon the facts and circumstances of each case. *Richards v. Wisconsin*, 520 U.S. at 394; *Ornelas*, 517 U.S. at 696.

¶ 20. In *Meyer*, we adopted the United States Supreme Court standard from *Richards v. Wisconsin* for when police may conduct a no-knock entry while executing a search warrant. *Meyer*, 216 Wis. 2d at 734–35. That standard requires that particular facts must be shown to establish reasonable suspicion, and burden is upon the State to establish such particular facts. *Id.* At issue in *Meyer* was a no-knock entry while executing an anticipatory search warrant. *Id.* at 746. The parties agreed that particular information or evidence was necessary, "but disagree[d] regarding what type of particular information or evidence will satisfy the reasonable suspicion test justifying a no-knock entry." *Id.* at 750. The State argued that "police officers may rely on their training and previous experience in similar situations to satisfy the particularity requirement." *Id.* "Meyer, on the other hand, argue[d] that facts specific to a particular party must be shown to support reasonable suspicion. . . ." *Id.* We held that particular facts must be shown, and the State's reliance solely upon the training and prior experience of the officers was not particularized enough. *Id.* at 751. Rather, relying only upon police officers' training and

experience was "essentially equivalent to the blanket rule" the United States Supreme Court repudiated in *Richards v. Wisconsin*.[7] *Id*. Although police officers' experience and training could be considered in establishing reasonable suspicion, they could be considered only in combination of facts particular to the case facing the officers.

¶ 21. The circuit court as well as the court of appeals concluded that the information in Officer Fahrney's affidavit was not sufficiently particularized to establish reasonable suspicion. We agree. The evidence specific to this case is that Clinton Bentley was an alleged drug-dealer and a confidential informer had purchased cocaine from him at the Bluff Street apartment. In addition, the affidavit relates Clinton Bentley and Shannon Eason's arrest records. According to Officer Fahrney's affidavit, Clinton Bentley had been arrested for aggravated assault, which, arguably, is a crime that suggests that he has used violence in the past and may resort to it again. However, that arrest took place in Illinois and we have no guidance as to how Illinois defines aggravated assault. The arrest was almost ten years old at the time the search warrant was issued. Moreover, it was just that—an arrest, not a conviction. We do not require an affidavit to eliminate all innocent explanations. *See State v. Anderson*, 155 Wis. 2d 77, 84, 454 N.W.2d 763 (1990) (suspicious behavior that might have an innocent explanation may

---

[7] In 1994, this court adopted a blanket rule that authorized no-knock entries where there was evidence of felony drug delivery or dealing. *See State v. Stevens*, 181 Wis. 2d 410, 511 N.W.2d 591 (1994); *State v. Richards*, 201 Wis. 2d 845, 549 N.W.2d 218 (1996) (overruled by *Richards v. Wisconsin*, 520 U.S. 385 (1997)).

still provide the basis for reasonable suspicion to justify an investigative stop). However, we agree with the court of appeals that "it is equally reasonable to assume that the reason no conviction was uncovered by the officer drafting the affidavit was that Bentley may have been released as the 'wrong man.' " *Eason*, 2000 WI App 73, ¶ 8.

¶ 22. Similarly, the affidavit indicated that Shannon Eason had been arrested 14 times. While her three obstructing arrests and two assault arrests may have involved violence, there are no specifics indicating as such. We do not know where these arrests took place, or whether she was ever convicted, and thus cannot determine whether violence was an element of those alleged crimes. We also do not know when these arrests took place, recently, or many years hence. The arrests thus provide little guidance in determining whether the Beloit police officers would be entering a dangerous situation.

¶ 23. At oral argument, the State indicated that we could consider Shannon Eason's arrests for obstructing in combination with Officer Fahrney's statement that persons involved in drug-related crimes will destroy evidence, if given the opportunity, to infer that knocking and announcing would thus have inhibited the effective investigation of the crime. However, this position had not been previously advocated by the State in its briefs, and was raised only in response to pointed questions from the court. In the absence of any other particularized evidence, and some link between Shannon Eason's arrests for obstruction and the possible destruction of evidence, this approach is not sufficient to establish reasonable suspicion.

¶ 24. The only other particularized evidence is that the police officers were likely to confront Clinton

Bentley, an alleged drug dealer from which a controlled buy of cocaine had been made recently. A no-knock entry authorized almost entirely on information of felony drug dealing could very well bring this case under the blanket rule that the Supreme Court rejected in *Richards v. Wisconsin*, 520 U.S. 385.

¶ 25. The remaining evidence—Officer Fahrney's training and prior experience, including his experience with the easily disposable nature of cocaine—is not particular to this case. Officer Fahrney's training and experience is certainly extensive. He had participated in 70 drug raids. But his training and experience alone is not sufficient to establish reasonable suspicion. As we held in *Meyer*, sole reliance upon a police officer's training and experience to establish reasonable suspicion is indistinguishable from the blanket rule that the United States Supreme Court rejected. 216 Wis. 2d at 751.

¶ 26. Admittedly, this is a close case. Although there is some particularized information in the arrest records, it is vague and somewhat outdated, and lacks any detail concerning convictions, if any. *See, e.g., United States v. Lucht*, 18 F.3d 541, 550–51 (8th Cir. 1994), *cert. denied*, 513 U.S. 949 (1994) (criminal record which contained a nine-year-old misdemeanor drug possession conviction and a thirteen-year-old charge for carrying concealed weapons insufficient particularized evidence to justify no-knock entry). The remainder, the felony drug dealing and the officer's training and experience, cannot be relied upon without running afoul of *Richards v. Wisconsin* and *Meyer*. Accordingly, we find that the affidavit was insufficient

to establish reasonable suspicion and, thus, the Commissioner erred in issuing a no-knock warrant.[8]

¶ 27. Yet, this conclusion does not end our inquiry. Officer Fahrney and his colleagues relied upon a warrant issued by a detached and neutral magistrate. Under similar circumstances, in *United States v. Leon*, 468 U.S. 897, 918–920 (1984), the United States Supreme Court recognized that applying the exclusionary rule would not effectuate its purpose to deter unreasonable police actions because the officers acted reasonably. *Leon* thus formulated a good faith exception to the exclusionary rule where police officers act in objectively reasonable reliance on a search warrant issued by a neutral and detached magistrate. "In so doing, the Court [wrote] another chapter in the volume of Fourth Amendment law opened by *Weeks v. United States*, 232 U.S. 383 (1914)." *Leon*, 468 U.S. at 927 (Blackmun, J., concurring).

---

[8] While the statements are somewhat confusing, the dissent appears to argue that because this court has failed to conclude in other cases that police officers had reasonable suspicion to act, the court should have concluded here that the officers had reasonable suspicion. *See* dissenting op. (Abrahamson, C.J.) at ¶ 76 n.1. Even though reasonable suspicion is "a less demanding standard than probable cause," it is a standard that must be met nonetheless, contrary to the dissent's implication. *Alabama v. White*, 496 U.S. 325, 330 (1990). Moreover, a cursory review of our past decisions reveals that aside from *State v. Kelsey*, 2001 WI 54, 243 Wis. 2d 422, 626 N.W.2d 777, we have recently declined to find reasonable suspicion. *See, e.g., State v. Meyer*, 216 Wis. 2d 729, 754, 576 N.W.2d 260 (1998) (remand for determination whether reasonable suspicion that exigent circumstances existed). *Meyer* is different from this case, however. Here, unlike *Meyer*, there is no need for remand. *See* n.34 herein.

¶ 28. Last term, in *State v. Ward*, we recognized a good faith exception when this court concluded that evidence found as a result of a no-knock warrant "should be admitted because the police officers acted in good faith reliance on law that was controlling at the time of the search." 2000 WI 3, ¶ 3. The case at hand indicates that the time has come for this court to add a chapter to its volume of law on the exclusionary rule, based upon a good faith exception that was adopted by *Leon*. To that end, we first discuss *Leon*. We then show that the development of the exclusionary rule in Wisconsin supports the adoption of a good faith exception for objectively reasonable reliance upon a facially valid search warrant. Finally, we determine whether, and under what circumstances, that exception applies.

## A

¶ 29. In *Leon*, the United States Supreme Court formulated an exception to the Fourth Amendment exclusionary rule where a police officer relied in good faith upon a search warrant issued by an independent and neutral magistrate. 468 U.S. at 919–20.[9] *Leon* involved the suppression of evidence obtained by way of a search warrant. 468 U.S. at 900. A confidential informant had notified the Burbank, California, Police Department that "Armando" and "Patsy" were selling large amounts of cocaine and methaqualone and that he had witnessed a sale of the methaqualone five months earlier. *Id.* at 901. Based upon this lead, there

___

[9] Even though *Leon* uses the expression "good faith," it is clear that the Supreme Court is not referring to subjective good faith, but an objectively reasonable standard discussed herein. *United States v. Leon*, 468 U.S. 897, 915 n.13 (1984).

was an extensive investigation that led the police to Alberto Leon. *Id.* In September, 1981, the police obtained a facially valid search warrant, and searched three residences and two cars. *Id.* at 902. They found drugs and other evidence, and Leon and others were charged with conspiracy to possess and distribute cocaine, among other things. *Id.* The supporting affidavit revealed the extensive investigation, but did not establish the reliability and credibility of the informant; in addition, the informant's information was stale. *Id.* at 904.

¶ 30. The District Court found the case a close one, but invalidated the search warrant and suppressed the evidence. *Id.* at 903. The District Court also found that the officer who provided the affidavit underlying the search warrant had acted in good faith, but rejected the Government's contention that an exception to the exclusionary rule applied on that basis. *Id.* at 903–04. The Ninth Circuit Court of Appeals also refused to apply a good-faith exception. *Id.* at 905.

¶ 31. The United States Supreme Court accepted that the police had violated Leon's Fourth Amendment rights; that is, the search warrant was invalid, and focused on the separate inquiry, whether an exclusionary sanction would be appropriate. *Id.* at 906 (quoting *Illinois v. Gates*, 426 U.S. 213, 223 (1983)). To resolve the appropriateness of an exclusionary sanction, the Court applied a cost/benefit analysis, balancing against the substantial social costs of excluding relevant evidence the benefit of deterring future police misconduct. *See Leon*, 468 U.S. at 907–09.[10] That anal-

---

[10] The benefits of the exclusionary rule relate to its dual purpose of deterring police misconduct and ensuring judicial integrity. The latter concerns whether the judiciary would be giving its imprimatur to police misconduct by admitting evi-

ysis led the court to find that the social cost of excluding the evidence far outweighed the benefit, if any, of deterrence. "[T]he marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* at 922.

¶ 32. According to the Supreme Court, there would be little deterrent effect from suppressing evidence obtained in objective reasonable reliance upon a warrant. The exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *Leon,* 468 U.S. at 919. The police officer who reasonably relied upon a facially valid search warrant has not engaged in any misconduct that would merit future deterrence. That "officer is acting as a reasonable officer would and should act in similar circumstances."[11] *Id.* at 920 (quoting *Stone v. Powell,* 428 U.S. 465, 539–540 (1976) (White J., dissenting)). Suppression would not "alter the behavior of

---

dence seized in violation of the Fourth Amendment. Regarding judicial integrity, *Leon* stated that "[o]ur cases establish that the question whether the use of illegally obtained evidence in judicial proceedings represents judicial participation in a Fourth Amendment violation and offends the integrity of the courts 'is essentially the same as the inquiry into whether exclusion would serve a deterrent purpose. . . .' " 468 at 921 n.22 (quoting *United States v. Janis,* 428 U.S. 433, 459 n.35 (1976)).

[11] *Leon* commented that even though "officer" is used therein in the singular form, consideration of the objective reasonableness of the reliance upon the warrant requires looking at the conduct of all of the officers associated with the warrant—"not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination." 468 U.S. at 923 n.24.

individual law enforcement officers or the policies of their departments," and thus, would not provide the desired deterrence. *Id.* at 918.

¶ 33. The mistake, if any, in issuing a search warrant that is subsequently found to be invalid is with the judge or magistrate who issued the warrant. Suppressing evidence obtained under such a warrant would not likely have any deterrent effect.

> [T]o the extent that the [exclusionary] rule is thought to operate as a "systemic" deterrent on a wider audience, it clearly can have no such effect on individuals empowered to issue search warrants. Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions. *The threat of exclusion thus cannot be expected significantly to deter them.* Imposition of the exclusionary sanction is not necessary meaningfully to inform judicial officers of their errors, and we cannot conclude that admitting evidence obtained pursuant to a warrant while at the same time declaring that the warrant was somehow defective will in any way reduce judicial officers' professional incentives to comply with the Fourth Amendment, encourage them to repeat their mistakes, or lead to the granting of all colorable warrant requests.

*Leon,* 468 U.S. at 917 (footnotes omitted) (emphasis added).

¶ 34. However, as *Leon* noted, notwithstanding the deference accorded to a magistrate's determination of probable cause or reasonable suspicion, the good faith exception does not mean that the reviewing court relinquishes its role in determining whether the Fourth Amendment has been violated. *Id.* at 914. The

"[d]eference to the magistrate. . .is not boundless." *Id.* Indeed, "it frequently will be difficult to determine whether the officers acted reasonably without resolving the Fourth Amendment issue." *Id.* at 925. Accordingly, *Leon* held that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.* at 918.

¶ 35. Regarding whether the police officers acted with objective reasonableness, the Court stated that " 'searches pursuant to a warrant will rarely require any deep inquiry into reasonableness,' for 'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.' " *Id.* at 922 (internal citations omitted).

> "Accordingly, our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances—including whether the warrant application had previously been rejected by a different magistrate—may be considered."

*Id.* at 923 n.23.

¶ 36. Yet, *Leon* emphasized that even where an officer has obtained a warrant and abided by its terms, exclusion may nonetheless be appropriate. *Id.* at 922. The standard of objective reasonableness requires, among other things, that police officers have a reasonable knowledge of what the law prohibits. *Id.* at 919 n.20. The officer cannot reasonably rely upon a war-

rant that was based upon a deliberately or recklessly false affidavit, or, a bare bones affidavit that she or he reasonably knows could not support probable cause or reasonable suspicion. *Id.* at 923. The officer cannot reasonably rely upon a warrant "so facially deficient" that she or he could not "reasonably presume it to be valid." *Id.* Also, the officer cannot reasonably rely upon a warrant issued by a magistrate that "wholly abandoned his [or her] judicial role." *Id.*

¶ 37. *Leon*, of course, was interpreting the exclusionary rule under the Fourth Amendment. However, insofar as "[t]his court has consistently and routinely conformed the law of search and seizure under the state constitution to that developed by the United States Supreme Court under the Fourth Amendment," Article I, Section 11 of the Wisconsin Constitution would not prevent this court from adopting a good faith exception to the exclusionary rule, as evidenced by the development of that rule. *State v. Fry*, 131 Wis. 2d 153, 172, 388 N.W.2d 565 (1986).[12]

## B

¶ 38. A non-exhaustive review of the development of the exclusionary rule in this court's cases reveals that the good faith exception to the exclusionary rule, where there is objectively reasonable reliance upon a search warrant issued by an independent magistrate, is naturally the next chapter.

¶ 39. Wisconsin first recognized the exclusionary rule in *Hoyer v. State*, 180 Wis. 407, 193 N.W. 89

---

[12] "But for a few inconsequential differences in punctuation, capitalization and the use of the singular or plural form of a word, the texts of Article I, Section 11 and the Fourth Amendment are identical." *State v. Fry*, 131 Wis. 2d 153, 172, 388 N.W.2d 565 (1986).

(1923). The evidence at issue had been obtained without a search warrant in violation of Article I, Section 11, and was "improperly received" in violation of Article I, Section 8, of the Wisconsin Constitution.[13] *Id.* at 415. Previously, the court had "squarely aligned itself with rulings" of the United States Supreme Court in determining that Article I, Section 8, corresponded to the Fifth Amendment, and required the exclusion of evidence that amounted to "compulsory self-incrimination."[14] *Id.* at 415–16. Similarly, this court concluded that evidence obtained in violation of Article I, Section 11, insofar as it corresponded to the Fourth Amendment, must also be excluded.

> We see no reason in logic, justice, or in that innate sense of fair play which lies at the foundation of such guarantees, why a court of justice, rejecting as abhorrent the idea of the use of evidence extorted by violation of a defendant's right to be secure in person and exempt from self-incrimination though it may result in murder going unwhipt of justice, should yet approve of the use, in the same court of justice, by state officers, of that which has been obtained by other state officers through, and by, a plain violation of constitutional guarantees of equal standing and value, though thereby possibly a violation of the prohibition law may go unpunished.

*Id.* at 417.

¶ 40. As this court looked to the United States Supreme Court in determining the remedy for a viola-

---

[13] Article I, Section 8 of the Wisconsin Constitution states in pertinent part that "[n]o person. . .may be compelled in any criminal case to be a witness against himself or herself."

[14] The Fifth Amendment to the United States Constitution states in pertinent part that "nor shall any person. . .be compelled in any criminal case to be a witness against himself."

tion of the constitutional guarantee against self-incrimination, this court also looked to that Court to determine the remedy for a violation of the constitutional guarantee against unreasonable searches and seizures. "The federal and many other courts. . .have held that on proper challenge the state will not be permitted to use against a defendant charged with crime evidence which appears to have been seized or obtained by government officials by or through a violation of constitutionally guaranteed rights." *Id.* at 412 (citing *Amos v. United States*, 255 U.S. 313 (1921), and *Gouled v. United States*, 255 U.S. 298 (1921)).[15]

¶ 41. Even though *Hoyer* recognized that a number of other states had already adopted the federal

---

[15] At this time, cases discussing the nascent exclusionary rule based it upon a "convergence theory" of the Fourth and Fifth Amendments. *See Andresen v. Maryland*, 427 U.S. 463, 472–73 (1976). That approach was subsequently abandoned.

> Language in opinions of this Court and of individual Justices has sometimes implied that the exclusionary rule. . .is required by the conjunction of the Fourth and Fifth Amendments. . . .The Fifth Amendment theory has not withstood critical analysis or the test of time, and the Fourth Amendment "has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons."

*Leon*, 468 U.S. at 905–06 (citations omitted).

In fact, *Gouled v. United States*, 255 U.S. 298 (1921) and another case that *Hoyer* relied upon, *Boyd v. United States*, 116 U.S. 616 (1886), were overturned in part by *Warden v. Hayden*, 387 U.S. 294, 301–02 (1967). *Warden* held that "mere evidence" seized from the accused, as opposed to contraband or the fruits of the crime did not, as previously held, violate the Fifth Amendment against self-incrimination. 387 U.S. at 301–03. Here, there is no contention that the evidence seized violated Eason's Fifth Amendment rights or his rights under Article I, Section 8. Accordingly, that part of *Hoyer*'s analysis is inapposite.

exclusionary rule, *Hoyer* relied solely upon federal law. *See* 180 Wis. 2d at 412–18. *Hoyer* relied upon *Amos*, 255 U.S. at 316, and *Gouled*, 255 U.S. at 303, which, in turn, relied upon *Weeks v. United States*, 232 U.S. 383 (1914), the Supreme Court's seminal formulation of the exclusionary rule. Only one state, Iowa, adopted an exclusionary rule prior to *Weeks*. *See Wolf v. Colorado*, 338 U.S. 25, 34 (1949) (overruled by *Mapp v. Ohio*, 367 U.S. 643 (1961)).

¶ 42. Wisconsin was not bound to apply the federal exclusionary rule in state courts until *Mapp v. Ohio*. Nonetheless, this court continued to look to United States Supreme Court decisions to determine the scope of its exclusionary rule. *See, e.g., State v. Leadbetter*, 210 Wis. 327, 329–30, 246 N.W. 443 (1933) (conservation warden justified in searching automobile without a warrant based upon *Carroll v. United States*, 267 U.S. 132 (1925)); *see also Gray v. State*, 243 Wis. 57, 64, 9 N.W.2d 68 (1943) (quoting *Carroll*, 267 U.S. at 153 (1925)). Since *Mapp v. Ohio*, this court has continued to look to federal cases interpreting the Fourth Amendment and the federal exclusionary rule to interpret Article I, Section 11, and Wisconsin's exclusionary rule. *See Fry*, 131 Wis. 2d at 170–74 and cases cited thereat.

¶ 43. The development of the law regarding the exclusionary rule included clarifying its role as a remedy for violations of the right to be free from unreasonable searches and seizures, rather than a right of the accused in and of itself. "The exclusionary rule is a judge-made one in furtherance of conduct that courts have considered to be in the public interest and to suppress conduct that is not."[16] *Conrad v. State*, 63

---

[16] This same clarification was made by the United States Supreme Court just a few months earlier.

Wis. 2d 616, 636, 218 N.W.2d 252 (1974). *Conrad* properly linked the exclusionary rule and the public interest, indicating that application of the rule is not absolute, but requires a weighing of the pertinent interests. Ostensibly, this balancing is not unlike the cost/benefit analysis in which *Leon* engaged.

¶ 44. *Conrad* also questioned the efficacy of the exclusionary rule in light of its twofold purpose: one, to deter police misconduct; and two, to ensure judicial integrity insofar as the judiciary would refuse to give its imprimatur to police misconduct by relying upon evidence obtained through that misconduct. *Id.* at 635. As to the rule's first goal, deterrence, the rule is inefficient insofar as it does not deter police misconduct directed at persons who are never charged or tried and thus have no opportunity to exercise the rule's exclusionary remedy. *Id.* The second goal, judicial integrity, is compromised where the exclusionary rule suppresses relevant evidence of guilt. *Id.* at 636. Yet, the court acknowledged that there is no good substitute for the rule, which had been adopted in *Hoyer*.

> To conclude as this court does that the exclusionary rule is a weak reed indeed to enforce the fourth amendment is not to suggest a specific replacement for it. At this stage of our legal history when the exclusionary rule has been given statutory sanc-

"The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.". . .In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.

*United States v. Calandra*, 414 U.S. 338, 347–48 (1974) (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)).

tions, its repeal or change is an obligation of the legislature. In addition, of course, the rule is mandated upon all states by *Mapp v. Ohio*. . . . Accordingly, this court is not now free to overrule *Hoyer*. . . .

*Id.* at 637. In fact, *Hoyer* had previously rejected the alternative remedy that had existed at that time, an "action for damages if there were any unlawful invasion of. . .constitutional rights." *Hoyer*, 180 Wis. at 412.

¶ 45. If the Wisconsin exclusionary rule were a right and not a remedy, this court would have broken ranks with United States Supreme Court cases which followed *United States v. Calandra*, 414 U.S. 338, 347–48 (1974), notwithstanding *Conrad*'s language which was subsequent to *Calandra*. But as this court continued to add to the exclusionary rule volume of law, it not only followed *Calandra*, but also followed those other United States Supreme Court cases that indicate that the exclusionary rule is a remedy, rather than a right. For example, in *State v. Gums*, 69 Wis. 2d 513, 516–17, 230 N.W.2d 813 (1975), this court relied upon *Michigan v. Tucker*, 417 U.S. 433, 447 (1974), which, in turn, relied upon *Calandra*. *Gums* emphasized that the "deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful or, at the very least, negligent conduct which has deprived a defendant of a constitutional right." 69 Wis. 2d at 517. Yet, "[w]here the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force." *Id.* (quoting *Michigan v. Tucker*, 417 U.S. at 447).

¶ 46. Despite this court's language in *Gums*, the court did not adopt a good faith exception then, in 1975. Nine years later, the United States Supreme Court decided *Leon*. After *Leon*, this court considered

whether to adopt the exception in *State v. Brady*, 130 Wis. 2d 443, 388 N.W.2d 151 (1986). *Brady* involved a material witness arrest warrant. *Id.* at 445. The court concluded that the warrant was invalid because the supporting affidavit did not specify that Brady's presence could not be secured by subpoena. *Id.* at 453. For the same reason, namely, that the affidavit was void of any indication that there was probable cause for the warrant, *Leon*'s good faith exception was not applicable.

> ₅ In *Leon* the Supreme Court expressly acknowledged that an officer would not "manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Leon*, 104 S. Ct. at 3422 [quoting *Brown v. Illinois*, 422 U.S. 590, 611 (1975) (Powell, J., concurring in part)]. The fourth amendment requires that the affidavit upon which the warrant was based had to contain sufficient facts to support a finding of probable cause regarding the impracticability of securing Brady's presence through a subpoena. Because the affidavit lacked indicia of probable cause regarding the impracticability of securing Brady's presence through a subpoena, this case does not present a question of "good faith." Therefore, *Leon* is not implicated.

*Id.* at 454.

¶ 47. Even though *Brady* did not adopt *Leon*, this court continued to look to the United States Supreme Court in deciding search and seizure issues. Within weeks of deciding *Brady*, this court reiterated that search and seizure law under Article I, Section 11 of the Wisconsin Constitution is generally coextensive with the federal exclusionary rule, neither broader nor

narrower. *See Fry*, 131 Wis. 2d at 175–76.[17] Among other things, conforming Wisconsin's exclusionary rule to the federal rule fosters uniformity in police work.

> One reason this court has refused to interpret Wisconsin's search and seizure provision differently than the Supreme Court has interpreted the fourth amendment is to prevent the confusion caused by differing standards. . . .[S]earch and seizure law is marked by hair-splitting distinctions and a complexity masked by simple formulations. It is obvious that police officers must often find it confusing as they enforce the law and investigate crime. Thus, we are reluctant to construe our state constitutional provision differently than the fourth amendment, especially since the two provisions are intended to protect the same interests and we are unconvinced that the Supreme Court provides less protection than intended by the search and seizure provision of the Wisconsin Constitution.

*Id.* at 173–74.

¶ 48. Likewise, after *Brady* and *Fry*, the court again emphasized that Wisconsin's exclusionary rule follows the federal rule in *State v. Tompkins*, 144 Wis. 2d 116, 423 N.W.2d 823 (1988). At issue in *Tompkins* was the warrantless search of an automobile. 144 Wis. 2d at 121. Tompkins argued that Article I, Section 11 required something more than the Fourth Amendment cases had held to search an automobile without a warrant, namely, exigent circumstances. *Id.* at 130. We disagreed, reiterating that *Hoyer* had relied "exclu-

---

[17] In *State v. Fry*, 131 Wis. 2d 153, 175, 388 N.W.2d 565 (1986), this court adopted the rule from *New York v. Belton*, 453 U.S. 454 (1981), that incident to a lawful arrest, police officers may search the interior of a car, even if the defendant is not in the vehicle at the time of the search.

sively upon federal cases," and that the court continued, since then, to look to interpretations of the Fourth Amendment in interpreting Article I, Section 11. *Id.* at 133–35. *Tompkins* also confirmed that, since its inception, the exclusionary rule has been a remedy, not a right.

> The protection of rights and the preservation of judicial integrity depend in reality on the deterrent effect of the exclusionary rule. Unlawful police conduct is deterred when evidence recovered in unreasonable searches is not admissible in courts. The Wisconsin cases discussed in *Hoyer* and statements of that court all concerned judicial protection against police oppression. That is, the exclusionary rule developed as a judicial remedy to deter unreasonable searches and seizures. The fourth amendment was and is a limit on the powers of government.

*Id.* at 133–34.

¶ 49. After *Brady*, the next opportunity this court had to consider a good faith exception to the exclusionary rule was *Ward*, 2000 WI 3. In *Ward*, the police officers had executed a no-knock warrant that was based upon case law establishing a blanket rule that where there is "evidence of felony drug delivery or dealing, the officers are justified in making a no-knock entry." *Id.* at ¶ 40; *see also State v. Stevens*, 181 Wis. 2d 410, 511 N.W.2d 591 (1994); *State v. Richards*, 201 Wis. 2d 845, 549 N.W.2d 218 (1996), *overruled by Richards v. Wisconsin*, 520 U.S. 385 (1997). However, after the officers had executed the no-knock search warrant, as noted above, the United States Supreme Court abrogated that blanket rule in *Richards v. Wisconsin*. 2000 WI 3, ¶ 41. *Ward* concluded that even though the no-knock warrant violated the Fourth Amendment and

Article I, Section 11 of the Wisconsin Constitution, the evidence was nonetheless admissible because "exclusion. . .would serve no remedial objective."[18] *Id.* at ¶ 63.

¶ 50. *Ward* accordingly adopted a good faith exception in those circumstances because, similar to the reasoning in *Leon*, "we do not believe that excluding the evidence seized by the police will serve any remedial objective, or that judicial integrity is sullied by admission of the evidence." *Id.* at ¶ 49. We did not rely upon *Leon*, but instead relied upon *Illinois v. Krull*, 480 U.S. 340 (1987) (*see Ward*, 2000 WI 3, ¶¶ 50–51) because *Krull* is factually closer to *Ward* than *Leon*. In *Krull*, the officers relied upon a statute that was later held unconstitutional as violative of the Fourth Amendment; however, the "Supreme Court concluded that the evidence should be admitted under a good-faith exception to the Fourth Amendment exclusionary rule." *Ward*, 2000 WI 3, ¶ 50 (citing *Krull*, 480 U.S. at 346, 360). *Ward* noted, without mentioning *Leon*, that the reasoning underlying *Leon*'s good faith exception applied not only to *Krull*, but also in *Ward*.

> The application of the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonable reliance on a statute would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant.

---

[18] In determining that Article I, Section 11 of the Wisconsin Constitution did not require exclusion of the evidence, this court again acknowledged the similarities between the state and the federal search and seizure provisions and that our interpretations are normally consistent with those of the Fourth Amendment. *State v. Ward*, 2000 WI 3, ¶ 55, 231 Wis. 2d 723, 604 N.W.2d 517.

*Ward*, 2000 WI 3, ¶ 50 (quoting *Krull*, 480 U.S. at 349–50).

¶ 51. Although *Ward* did not mention *Leon*, *Ward* should not be interpreted, contrary to suggestions otherwise, as assiduously trying to avoid relying upon *Leon*. *Ward* did not need to rely upon *Leon*, since *Krull* was more closely on point. But *Krull* did rely upon *Leon*, quoting from it extensively throughout, and opening with the observation that the permutation of the good faith exception *Krull* would recognize was inextricable from the one formulated in *Leon*.

> In *United States v. Leon*, 468 U.S. 897 (1984), this Court ruled that the Fourth Amendment exclusionary rule does not apply to evidence obtained by police officers who acted in objectively reasonable reliance upon a search warrant issued by a neutral magistrate, but where the warrant was ultimately found to be unsupported by probable cause. See also *Massachusetts v. Sheppard*, 468 U.S. 981 (1984). The present case presents the question whether a similar exception to the exclusionary rule should be recognized when officers act in objectively reasonable reliance upon a *statute* authorizing warrantless administrative searches, but where the statute is ultimately found to violate the Fourth Amendment.

*Krull*, 480 U.S. at 342 (emphasis in original).

¶ 52. The relationship between *Leon* and *Krull* is nearly the reverse of the relationship between *Ward* and the instant case. *Krull* relied upon *Leon* to apply the good faith exception recognized in *Leon* under different circumstances. Here, we not only rely upon *Leon*, but also apply the good faith exception recognized in *Ward* under different circumstances. Indeed, there is no good reason to distinguish between the

*Krull* and *Leon* permutations of the good faith exception, or the good faith exception recognized in *Ward*, and the one we adopt here today. Just as *Ward* concluded that the good faith exception for reliance upon a judicial pronouncement did not offend Article I, Section 11 of the Wisconsin Constitution, a good faith exception for objective, reasonable reliance upon a search warrant does not offend the Wisconsin Constitution. In both situations, applying the exclusionary rule will have no deterrent effect. In both situations, the officers were acting reasonably, whether relying upon controlling law, or a facially valid search warrant.[19]

[19] Arguably, as pointed out in Chief Justice Abrahamson's dissent in *Ward*, a good faith exception based upon reasonable objective reliance on a warrant issued by a neutral and detached magistrate is less offensive to the principles underlying the exclusionary rule than one based upon judicial pronouncements.

> *Krull* sweeps broadly and authorizes the use of evidence seized in a whole class of unconstitutional searches, that is, those conducted pursuant to a statutory enactment which is later declared unconstitutional. The *Krull* rule means that an appellate court need not review each case falling within the class. In contrast, the *Leon* case deals with a single unconstitutional judicial authorization of a particular search under particular circumstances; an appellate court reviews each warrant to determine whether that case falls within the *Leon* "good faith" exception to the exclusionary rule. Because of the sweeping reach of *Krull*, commentators and courts have found the *Krull* rule more problematic than the *Leon* rule.

*Ward*, 2000 WI 3, ¶ 83 (Abrahamson, C.J., dissenting). We do not agree. In both *Krull* and *Leon*, and in both *Ward* and this case, the deterrence purpose of the exclusionary rule would not be effectuated if applied to suppress evidence where the police officers acted reasonably; hence, a good faith exception.

## C

¶ 53. Even though the good faith exception has been long recognized by the United States Supreme Court and was recognized by this court last year, Eason and amicus contend that this court should not adopt the exception here. Eason makes a number of specific arguments against recognizing a good faith exception: one, that Wisconsin's exclusionary rule is a right, not a remedy; two, recognizing a good faith exception would effectively abrogate the rule; three, recognizing a good faith exception cannot be done without overruling *Hoyer*; and four, that *Leon*'s cost/benefit analysis was in error. We address each in turn.

¶ 54. *Ward* addressed Eason's first argument, namely, "whether the exclusionary rule adopted in *Hoyer* is merely a judge-made rule, as the State contends, or whether, as the defendant argues, it is a personal right under the Wisconsin Constitution." *Ward*, 2000 WI 3, ¶ 57. Referring to *Tompkins'* conclusion that the exclusionary rule is a remedy, not a right, *Ward* stated that "[w]e have decided this question and there is no need to revisit it." *Id.* Similarly, there is no need to revisit that argument here.[20]

¶ 55. Eason and amicus contend, in essence, that a good faith exception to the exclusionary rule would

[20] Moreover, as noted above, if the exclusionary rule were a right, rather than a remedy, this court would not have followed *Calandra*'s lead. However, this court has relied upon *Calandra*, quoting specifically its reference to the exclusionary rule as a "remedial device" in determining that the rule should not be extended to a parolee's statements to his or her parole agent in the revocation hearing setting. *State ex rel. Struzik v. DHSS*, 77 Wis. 2d 216, 221, 252 N.W.2d 660 (1977).

effectively abrogate the exclusionary rule.[21] However, the good faith exception recognized in *Ward* apparently had no such effect. Similarly, a good faith exception recognized here would not have such effect. The exception operates only in those close cases where a reviewing court finds that the issuing magistrate erroneously concluded that there was probable cause, or, in a case such as this one, reasonable suspicion. In those cases where there is no objectively reasonable support for the warrant, the officers could not be found to have, according to an objective standard, reasonably relied upon the warrant. The good faith exception, as found in *Ward*, is the result of recognizing that, in certain situations, the exclusionary rule, if applied, would have no deterrent effect. As in *Ward*, here, the police officers engaged in no abuse or misconduct. Similarly, contrary to the dissent's suggestion, admitting the evidence would not compromise judicial integrity—the judiciary giving its imprimatur to police misconduct—because no such misconduct occurred.[22] *See* dissenting op. (Abrahamson, C.J.) at ¶ 93.

---

[21] Amicus' argument is that a good faith exception would "water[ ] down" or "burden[ ]" or "change" the exclusionary rule. (Amicus Br. at 6.)

[22] Also, contrary to amicus' argument, the good faith exception does not remove the magistrate's probable cause or reasonable suspicion determination from judicial review. (*See* Amicus Br. at 14.) Similarly, contrary to the dissent's contention, the good faith exception does not shift the focus of a suppression hearing from an inquiry into whether the search complied with the constitution to whether the police officers objectively, and reasonably, relied upon a search warrant. *See* dissenting op. (Abrahamson, C.J.) at ¶ 95. Instead, as *Leon* pointed out, the Fourth Amendment analysis typically should be done first to determine whether there is any need to proceed to a good faith exception. 468 U.S. at 925. If the warrant is valid,

■

¶ 56. Indeed, if, as Eason's second argument implies, recognizing an exception to the exclusionary rule effectively abrogates it, then, the rule was abrogated long ago, which is hardly the case. Rather, even though a warrantless search, or a search based upon an invalid warrant, is per se unreasonable, the courts and the legislature have recognized " 'specifically established and well delineated exceptions' " through the years. *State v. Monahan,* 76 Wis. 2d 387, 395, 251 N.W.2d 421 (1977) (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 445 (1972). "Contraband in plain view, consent, lawful arrest, exigent circumstances, hot pursuit or a 'stop and frisk' present circumstances which may justify an exception to the warrant requirement."[23] *Id.* at 396 (footnotes omitted). Also, the legislature has recognized an exception to the exclusionary rule for technical irregularities on the search warrant. Wis. Stat. § 968.22.[24]

■

¶ 57. Obviously, contrary to Eason's third contention, recognizing exceptions to the warrant requirement does not result in the overruling of *Hoyer.*

---

there is no need for a good faith exception. If the warrant were found to be invalid, the reviewing court would proceed to determining whether the good faith exception would apply. These are precisely the steps we have taken in reviewing this case.

[23] The legislature has enacted statutes that contain some of these exceptions. *See, e.g.,* Wis. Stat. § 968.11 (search incident to a lawful arrest); Wis. Stat. § 968.25 (search during temporary questioning).

[24] Wisconsin Stat. § 968.22 provides:

No evidence seized under a search warrant shall be suppressed because of technical irregularities not affecting the substantial rights of the defendant.

*Leadbetter, Gray* and *Ward* did not overrule *Hoyer* just as *Carroll* did not overrule *Weeks.* The exclusionary rule is part of search and seizure jurisprudence. We would no more overrule *Hoyer* than we could overrule *Mapp v. Ohio. See Conrad,* 63 Wis. 2d at 637. Correspondingly, contrary to the apparent conclusion of the court of appeals below, this court need not overrule *Hoyer* in order to adopt a good faith exception to the exclusionary rule.[25]

---

[25] Eason contends that not only will recognizing a good faith exception overrule *Hoyer,* but it will overrule *Hoyer*'s progeny, which, according to Eason, include the following cases: *State v. Kroening,* 274 Wis. 266, 79 N.W.2d 810 (1956); *Glodowski v. State,* 196 Wis. 265, 220 N.W. 227 (1928); *State v. Jaeger,* 196 Wis. 99, 219 N.W. 281 (1928); and *Jokosh v. State,* 181 Wis. 160, 193 N.W.976 (1923). Defendant overstates the effect of the good faith exception. These cases have been distinguished or implicitly overruled by subsequent decisions. For example, *Kroening* held that a blood alcohol test, taken without a warrant or the defendant's consent after the defendant admitted that he had been the driver of an automobile involved in an accident in the opposite lane of traffic, violated Article I, Section 11. 274 Wis. at 271. However, in *State v. Zielke,* 137 Wis. 2d 39, 54, 403 N.W.2d 427 (1987), this court noted that "warrantless blood seizures have been considered constitutionally permissible since the *Schmerber [v. California,* 384 U.S. 757 (1966)] decision," so long as there is probable cause and exigent circumstances. (*Kroening* did not consider whether there were exigent circumstances.) Wisconsin also subsequently passed legislation regarding implied consent for alcohol blood tests. *See* Wis. Stat. § 343.305.

In *Glodowski,* the court held that the affidavit application was insufficient to support a finding of probable cause because it was not based upon personal knowledge. 196 Wis. at 274. Subsequently, in *Kraus v. State,* 226 Wis. 383, 386, 276 N.W. 303 (1937), the court noted that the "evidence upon which the magistrate may act may be circumstantial and be based upon information and belief," and distinguished *Glodowski.*

■■■

¶ 58. Eason's fourth argument, that *Leon*'s cost/benefit analysis is flawed, is based upon studies of the application of the exclusionary rule. However, *Leon* concluded, as did *Ward*, that there is no benefit from applying the exclusionary rule where it will have no deterrent effect; that is, where the police officer did not act unreasonably. Consequently, where there is no real benefit in regard to deterrence, the social cost of excluding relevant evidence will always be the determining factor.[26]

---

In *Jaeger*, the court concluded that the evidence underlying the search warrant was stale. 196 Wis. at 101. The court did not consider a good faith exception, and the fact that a court would subsequently consider such an exception does not abrogate *Jaeger*. *Jaeger* did not hold that there could be no good faith exceptions. Finally, in *Jokosh*, the evidence at issue was a bottle forcibly taken from the defendant. 181 Wis. at 161. The search warrant covered only the premises where the defendant was working, not the defendant. *Id.* at 162. The evidence was thus not obtained under a warrant, and consequently, a good faith exception would not apply.

[26] Contrary to the dissent's suggestion, the cost of excluding evidence where police officers objectively relied in good faith upon a search warrant is *not* just a "lost prosecution." *See* dissenting op. (Abrahamson, C.J.) at ¶ 97. Rather, society and the victim pay a considerable price when the arguably guilty go unpunished. The court acknowledged this cost years ago in *Conrad v. State*, 63 Wis. 2d 616, 218 N.W.2d 252 (1974).

> [O]ur preoccupation with the exclusion of illegally obtained evidence that is highly probative of guilt has blinded courts and legislatures to wrongs that may be done those who are clearly innocent. . . .Its purpose, though noble, is simply not effectuated when it can only be made to apply against society for the benefit of the arguably guilty.

*Id.* at 636–37 (footnote excluded).

¶ 59. In the 17 years since *Leon* became law, there is no evidence here, and none has been offered, that the good faith exception has given rise to increased police abuse or oppression.[27] Moreover, as the dissent points out, more states (16 and the District of Columbia) have adopted the good faith exception than have rejected it (14). *See* dissenting op. (Abrahamson, C.J.) at ¶ 98 n.40. Of course, since *Leon*, the good faith exception applies throughout the federal system.

¶ 60. However, we have stated that the fact that this court has followed the United States Supreme Court does not dictate that we always will.

> It is always conceivable that the Supreme Court could interpret the fourth amendment in a way that undermines the protection Wisconsin citizens have from unreasonable searches and seizures under article I, section 11, Wisconsin Constitution. This would necessitate that we require greater protection to be afforded under the state constitution than is recognized under the fourth amendment. We have not reached that point with the Supreme Court's adoption of the *Belton* bright-line rule for determining the scope of a search incident to an arrest, insofar as an automobile is concerned.

[27] The dissent relies upon an article, *The Exclusionary Rule on the Scaffold: But Was It a Fair Trial?*, by Silas Wasserstrom and William J. Mertens, published at 22 Am. Crim. L. Rev. 85 (1984), to suggest that we have been "silent," and have not sufficiently considered the potential effects of recognizing the good faith exception. *See* dissenting op. (Abrahamson, C.J.) at ¶ 93 n.25 & ¶ 94 n.28. The concerns in this article were raised shortly after *Leon* was decided. There has been no evidence that what was feared by those two authors has come to pass.

*Fry*, 131 Wis. 2d at 174. Indeed, herein, we find that Article I, Section 11 of the Wisconsin Constitution guarantees more protection than the Fourth Amendment provides under the good faith exception as adopted in *Leon.*

¶ 61. Since *Leon*, legal scholars have debated the good faith exception. *See, e.g.*, Donald Dripps, *Living With Leon*, 95 Yale L.J. 906 (1986); Steven Duke, *Making Leon Worse*, 95 Yale L.J. 1405 (1986); Donald Dripps, *More on Search Warrants, Good Faith, and Probable Cause*, 95 Yale L.J. 1424 (1986). The fear expressed about the good faith exception is that the exception undermines the deterrent effect of suppression and even countenances the demise of the exclusionary rule. *See* Donald Dripps, *Living With Leon*, 95 Yale L.J. 906, 929–30 (1986) (hereinafter "Dripps"); *see also* Yale Kamisar, *Gates, "Probable Cause," "Good Faith," and Beyond*, 69 Iowa L. Rev. 551, 614–15 (1984). However, this court, as well as the United States Supreme Court, has repeatedly encouraged police officers to obtain search warrants. *See, e.g., State v. DeSmidt*, 155 Wis. 2d 119, 133, 454 N.W.2d 780 (1990); *Massachusetts v. Upton*, 466 U.S. 727, 733 (1984). Where a warrant has been issued, the attendant costs in obtaining that warrant diminishes the likelihood that the police are engaged in some sort of harassment or fishing expedition. "The prospect of suppression, then, encourages the use of warrants, but once it becomes clear that admission of the evidence depends on securing a warrant, the costs of the warrant process, independent of the exclusionary rule, create a powerful disincentive to speculative searches." Dripps, 95 Yale L.J. at 928.

¶ 62. The expenditures—in time and effort—of the warrant process can include a substantial investi-

gation of the alleged criminal activity and review of the affidavit supporting the warrant. "In most large jurisdictions, a line officer who wants to obtain a warrant must present the project either to a superior within the police organization or to a government attorney. This review can lead to the rejection of unsupportable applications and to the presentation of other applications in the strongest possible terms." *Id.* at 930 (footnotes omitted). Indeed, in *Leon*, there was an extensive investigation and the warrant application had been reviewed by several deputy district attorneys. 468 U.S. at 902.

¶ 63.　According to one scholar of the good faith exception, "well-trained officers would not seek a warrant without (1) significant independent investigation and (2) internal screening by a police superior or a government lawyer." Dripps, 95 Yale L.J. at 932.[28]

---

[28] The dissent quotes extensively from this article, *Living with Leon*, to suggest that we are adopting a test based upon the work of a scholar who disagreed with the good faith exception. *See* dissenting op. (Abrahamson, C.J.) at ¶ 91 nn.17 & 19, ¶ 95 n.31, ¶ 96 n.34. To the contrary, the article "defend[ed] the *Leon* result," even though it "criticize[d] the justification offered in the Court's opinion." 95 Yale L.J. 906. Moreover, the author suggested that the safeguards we require herein would "provide a stronger check on speculative searches than the exclusionary rule." *Id.* at 907.

The dissent is also mistaken that Professor Dripps has since suggested additional safeguards. *See* dissenting op. (Abrahamson, C.J.) at ¶ 91 n.18 (citing Donald Dripps, *The Case for the Contingent Exclusionary Rule*, 38 Am. Crim. L. Rev. 1 (2001)). Rather, in his latest article, Professor Dripps suggests that the current exclusionary rule be *replaced* with a contingent exclusionary rule. "The gist of the proposal is that courts should begin to experiment with suppression orders that are contin-

This is not an onerous or unreasonable requirement. Accordingly, we require that in order for the good faith exception to apply, the State must show that the process used attendant to obtaining the search warrant included a significant investigation and a review by a police officer trained in, or very knowledgeable of, the legal vagaries of probable cause and reasonable suspicion, or a knowledgeable government attorney.[29] While this process was followed in *Leon*, the United States Supreme Court did not specifically hold that the Fourth Amendment required a significant investigation and review of the warrant application in order for the good faith exception to apply.[30] However, we hold that Article I, Section 11 of the Wisconsin Constitution requires this process and thus affords additional protection than that which is afforded by the Fourth Amendment. Indeed, in some instances, "the Wisconsin Constitution may afford greater protection than the United States Constitution." *State v. Hansford*, 219

gent on the failure of the police department to pay damages set by the court." Donald Dripps, *The Case for the Contingent Exclusionary Rule*, 38 Am. Crim. L. Rev. 1, 2 (2001). Is the dissent, which suggests that we are betraying Wisconsin's long-standing commitment to the exclusionary rule (*see* dissenting op. (Abrahamson, C.J.) at ¶ 92), advocating such a replacement for the exclusionary rule?

[29] The term government attorney does *not* refer to the magistrate or court commissioner or judge who issues the search warrant.

[30] Even though we typically follow closely the interpretations of the Fourth Amendment to ensure uniformity in police work, *see Fry*, 131 Wis. 2d at 173–74, such uniformity is fostered more by the substantive requirements of search and seizure law. The additional procedural requirement of a significant investigation and a review of the search warrant application will not impede that uniformity.

Wis. 2d 226, 242, 580 N.W.2d 171 (1998); *see also Hoyer v. State*, 180 Wis. 407.[31]

## VI

¶ 64. Now that we have delineated the parameters of the good faith exception we adopt today, we turn to determining whether that exception applies here. As in *Leon*, "the case [is] a close one." 468 U.S. at 903. As in *Leon*, "[t]he affidavit related the results of an extensive investigation and, as the opinions of the divided panel of the Court of Appeals make clear, provided evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause," or reasonable suspicion. 468 U.S. at 926. Similarly, here, there may be disagreement as to whether Officer Fahrney's affidavit provided sufficient information to establish reasonable suspicion. Nonetheless, as the officers relied upon the search warrant in *Leon*, Officers Fahrney, McMahon, and other officers, relied upon the warrant in making an unannounced entry.[32]

---

[31] It is worth remembering that at the time that we first adopted the exclusionary rule, the United States Supreme Court had not yet required the states to do so. Consequently, at that time, Article I, Section 11 provided more protection than the Fourth Amendment. Under the good faith exception we recognize today, Article I, Section 11 provides more protection than the Fourth Amendment. Although this court typically follows the dictates of the Supreme Court in interpreting the Fourth Amendment, we specifically adopt additional requirements for the good faith exception to the exclusionary rule to apply under Article I, Section 11 of the Wisconsin Constitution.

[32] As the dissent notes, the law strongly favors search warrants. *See* dissenting op. (Abrahamson, C.J.) at ¶ 77. Search warrants provide that "reliable safeguard against improper searches." *Leon*, 468 U.S. at 913–14.

Consequently, here, as in *Leon* (*see id.* at 903–04), the argument that the officers acted in good faith was made. (State's Resp. to Def.'s Mot. to Dismiss and Suppress at 1; Mot. Hr'g at 6–8.) Yet, here and in *Leon*, the trial courts and the courts of appeals did not, and could not, rely upon a good faith exception that had not yet been adopted by the highest court. *See Leon*, 468 U.S. at 904. But, had the exception been recognized, it would have likely been applied in this case, as indicated by Rock County Circuit Court Judge Dahlberg's remarks at the suppression hearing:

> I understand the District Attorney's argument as to good faith. I have heard it before. But our Supreme Court has yet to adopt *Leon*. There is one—I believe there is only one case where the Court of Appeals arguably bought the good-faith argument. But I don't think good faith will get us out. And unless and until the Supreme Court adopts *Leon*—and they haven't done so as of this date to my knowledge, so—the motion is well taken. It is granted. The substances seized as a result of the no-knock warrant are suppressed.

(Mot. Hr'g at 10.)

¶ 65. Because there is insufficient particularized evidence in Officer Fahrney's affidavit to establish the reasonable suspicion necessary to justify a no-knock warrant, the exclusionary rule would cause suppression of the cocaine found unless the good faith exception applies. We find that it does.

¶ 66. Officer Fahrney and his colleagues relied with objective reasonableness upon the no-knock search warrant. There have been no allegations that Officer Fahrney and the officers with him executed the warrant in any manner other than according to the

terms of that warrant.[33] There have been no allegations that the warrant was so *facially* deficient that a reasonable, well-trained officer would not have relied upon it. Indeed, there are no contentions that there are technical or other glaring deficiencies with the warrant. The affidavit is not sketchy or bare-boned. It is deficient only insofar as it fails to provide sufficiently particularized evidence to show that an announced entry would be dangerous or result in the destruction of evidence.

¶ 67. Eason's contention is that the officers could not have reasonably relied upon the no-knock warrant because the affidavit was " 'so lacking in indicia of probable cause [or reasonable suspicion] as to render official belief in its existence entirely unreasonable.' " *Leon*, 468 U.S. at 923 (citations omitted). It could hardly be found that there was no indicia of reasonable suspicion to support a no-knock warrant. These are not the circumstances that faced this court in *Brady*, where there were no facts alleged to support the material witness arrest warrant. 130 Wis. 2d at 454. Here, there were facts alleged to support the no-knock warrant; just not sufficiently particularized facts.

¶ 68. Nonetheless, it is the magistrate's responsibility, not the officer's, to determine whether the officer's allegations sufficiently establish reasonable suspicion. "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his [or her] judgment that the form of the warrant is technically sufficient. '[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law.' "

_____

[33] We look to the conduct of all the officers associated with the warrant in determining whether there was objectively reasonable reliance. *Leon*, 468 U.S. at 932 n.24.

260

*Leon*, 468 U.S. at 921 (quoting *Stone v. Powell*, 428 U.S. at 498 (Burger, C.J., concurring)).

¶ 69. There also have been no allegations that the magistrate here, the Rock County Court Commissioner, Stephen D. Meyer, abandoned his neutral and independent role. "In the absence of an allegation that the magistrate abandoned his [or her] detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Leon*, 468 U.S. at 926. However, there have been no allegations that Officer Fahrney, who provided the underlying affidavit, knew that the statements therein were false, or that he was reckless in the preparation of the affidavit, or that he did not have an objective belief in the information presented. Accordingly, suppression would be inappropriate here.

¶ 70. Moreover, the additional process we adopt today of ensuring that the warrant was obtained after a significant investigation and review by a knowledgeable police officer or government attorney certainly appears to have been followed. From the face of Officer Fahrney's affidavit, it is evident that there was a significant investigation. (Fahrney Aff. at 1–5.) Officer Fahrney was assigned to the Special Operation Bureau of the Beloit Police Department to, among other things, "investigate complaints of drug trafficking." (Fahrney Aff. at 3.) He was thus aware of confidential files kept in that unit and the two "pieces of intelligence indicating that Clinton Bentley is a drug dealer." (Fahrney Aff. at 2.) Officer Fahrney worked with a confidential informant to purchase a cocaine-like substance from Clinton Bentley, which he had subsequently tested. (Fahrney Aff. at 2.) The substance tested as cocaine.

(Fahrney Aff. at 2–3.) Officer Fahrney reviewed Beloit Police records and learned that Clinton Bentley resided at 802 Bluff Street in Beloit, the location where the confidential informant had purchased the cocaine. (Fahrney Aff. at 3.) Officer Fahrney reviewed utility records, and learned that Shannon Eason was responsible for the utilities at 802 Bluff Street. *Id.* He also researched Clinton Bentley and Shannon Eason's criminal arrest records, and learned that Bentley had been arrested for aggravated assault and that Shannon Eason had multiple arrests for larceny, assault, and obstructing. *Id.*

¶ 71. It is also evident that the search warrant and Officer Fahrney's affidavit were reviewed by one or more government lawyers, if not drafted with their assistance.[34] The warrant and affidavit reflect advanced legal training, beyond that given to a well-trained police officer. The warrant and affidavit are

---

[34] As noted earlier, we review the warrant, including Officer Fahrney's affidavit, because the suppression hearing involved only a review of those documents. (*See* ¶ 10.) We note that this situation is not typical. Usually, suppression hearings include testimony from the police officers involved in the investigation, the drafting of the affidavit used to apply for the warrant, and the execution of the warrant. However, we find no reason to remand this case for the circuit court to conduct another hearing to determine whether the good faith exception applies, since the evidence before us is sufficient. Officer Fahrney's affidavit reflects the requisite investigation and review. It was objectively reasonable for the officers to rely upon the warrant, which was deficient only insofar as it failed to allege sufficiently particularized facts to establish reasonable suspicion justifying a no-knock entry. In future cases, we expect that there will be testimony offered at the suppression hearing on questions concerning significant investigation and review by a knowledgeable police officer or government attorney.

replete with terms normally found in attorney-drafted documents, including "whereas," "curtilage," "to-wit," and other such similar terms. (*See* Fahrney Aff. at 1.) Officer Fahrney repeatedly refers to himself as "your affiant." (*See e.g.*, Fahrney Aff. at 2.) The affidavit uses phrases that indicate that it was written to comport with the dictates of Fourth Amendment law, including "reliable confidential informant." *See, e.g., Adams v. Williams*, 407 U.S. 143 (1972). Similarly, the affidavit relates Officer Fahrney's extensive training and experience in order to support a finding of reasonable suspicion. *See, e.g., State v. Meyer*, 216 Wis. 2d 729, 752–53, 576 N.W.2d 260 (1998).

¶ 72. That one or more government attorneys likely assisted with drafting or reviewed the warrant and Officer Fahrney's affidavit is not only evident from the face of the documents, but is also in accordance with usual procedures in counties throughout Wisconsin. (Indeed, it is not at all unusual that an attorney—either an assistant district attorney or the district attorney—accompanies the police officer who is applying for a warrant to the magistrate.[35] ) Although

---

[35] Contrary to the dissent's suggestion, we do not infer that either an assistant district attorney or the district attorney accompanied Officer Fahrney to the magistrate. *See* dissenting op. (Abrahamson, C.J.) at ¶ 88. However, we do note that even the dissent acknowledges that government attorneys "often review warrants." *See* dissenting op. (Abrahamson, C.J.) at ¶ 94 n.28 (citing Silas Wasserstrom & William J. Mertens, *The Exclusionary Rule on the Scaffold: But Was It a Fair Trial?*, 22 Am. Crim. L. Rev. 85, 114 (1984)). In fact, the article the dissent relies upon notes that "[p]rosecutors obviously want to assure that evidence seized by the police will be admissible a[t] trial. This is why many state and federal prosecutors take an active

the warrant and affidavit at issue here do not explicitly indicate that this process was followed, it certainly can be reasonably inferred from the face of those documents that there was some involvement and review by a government attorney.[36] Because the process we

role in reviewing, or even preparing, warrant applications before they are presented to a magistrate." Silas Wasserstrom & William J. Mertens, *The Exclusionary Rule on the Scaffold: But Was It a Fair Trial?*, 22 Am. Crim. L. Rev. 85, 114 (1984) (footnote omitted). Indeed, one fear about the good faith exception was that it would "eliminate. . .the incentive. . .prosecutors [have] to assure that warrant searches comply with the requirements of the fourth amendment." *Id.* We have eliminated that fear by requiring the review of the search warrant and affidavit as outlined herein.

[36] The better rule for the future is that search warrant applications should reflect not only substantial investigation, but also a review by a knowledgeable government attorney or a police officer trained to be knowledgeable in such matters.

We do not expect, as the dissent contends, that in every future case where a court applies the good faith exception, the court will rely solely upon inferences that the safeguards we require herein have been met. *See* dissenting op. (Abrahamson, C.J.) at ¶ 90. Whether there has been a significant investigation may depend upon reasonable inferences from the record, as evident in *Leon*, 468 U.S. at 901. Further, we expect that whether a knowledgeable government attorney or a police officer trained in the vagaries of reasonable suspicion and/or probable cause has reviewed the warrant application may appear on the face of that application, but we expect that usually there will be testimony offered at the suppression hearing on such safeguards.

Moreover, we expect that both judges and police officers will continue to uphold the law and, with that in mind, strongly disagree with the dissent's suggestion to the contrary in quoting with approval the language that "the good faith exception 'makes a comparative judgment of the malevolence level of

264

adopt was apparently followed, and the police officers reasonably relied upon a no-knock warrant that was issued by an independent magistrate, the good faith exception to the exclusionary rule applies.[37]

## VII

¶ 73. In sum, this case presents the best situation to recognize what has long been recognized in other jurisdictions—the good faith exception to the exclusionary rule based upon objective, reasonable reliance upon a facially valid search warrant. There was insufficiently specific evidence to give rise to reasonable suspicion for the no-knock portion of the warrant. However, excluding the evidence obtained as a result of the search is not an appropriate remedy. The police would not be deterred because they reasonably relied upon a warrant issued by an independent magistrate. Excluding evidence would punish the officers, and society, for an error of the magistrate. No deterrence would

judges generally versus police generally.' " *See* dissenting op. (Abrahamson, C.J.) at ¶ 93 n.23 (quoting Wayne R. LaFave, *Search and Seizure* § 1.3(d) at 60–61 (3d ed. 1996)).

[37] Contrary to the dissent's suggestion, we do apply the very test we espouse here today. *See* dissenting op. (Abrahamson, C.J.) at ¶ 84. That we have not come to the conclusion that the dissent would have us come to does not mean that we are disingenuous; it just means that we disagree. *See id.* Moreover, we trust that the circuit courts and court of appeals will be able to determine whether there has been a significant investigation and a review by a trained police officer or knowledgeable government attorney. *See id.* at ¶ 83. The dissent has apparently forgotten that each day the lower courts have to apply legal standards to the facts before them, and that we have great confidence in the ability of the judges to do so. Certainly the test we set forth today is no more demanding than the test for reasonable suspicion.

result. As stated earlier, the exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *Leon*, 468 U.S. at 919.

¶ 74. Accordingly, we adopt a good faith exception to the exclusionary rule. We hold that where police officers act in objectively reasonable reliance upon the warrant, which had been issued by a detached and neutral magistrate, a good faith exception to the exclusionary rule applies. We further hold that in order for a good faith exception to apply, the burden is upon the State to show that the process used in obtaining the search warrant included a significant investigation and a review by either a police officer trained and knowledgeable in the requirements of probable cause and reasonable suspicion, or a knowledgeable government attorney. We also hold that this process is required by Article I, Section 11 of the Wisconsin Constitution, in addition to those protections afforded by the good faith exception as recognized by the United States Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984).

¶ 75. Just as the United States District Court and the Ninth Circuit Court of Appeals properly refused to recognize a good faith exception until the United States Supreme Court had done so in *Leon*, the circuit court and court of appeals did not recognize a good faith exception here. Those courts were correct in granting Eason's motion to suppress. However, now that we have recognized a good faith exception, and found that it applies in this case, we conclude that Eason's motion to suppress should have been denied.[38] We therefore reverse the court of appeals decision that

---

[38] Because we conclude that the good faith exception to the exclusionary rule applies here, we need not consider the State's

affirmed the circuit court's order suppressing the evidence, and remand the case to the circuit court for further proceedings.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶ 76. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(dissenting)*. Today's decision is momentous. It is a break from the long line of decisions that have so watered down the Fourth Amendment requirement of reasonable suspicion that this court has rarely held a search or seizure unconstitutional on Fourth Amendment grounds.[1]

¶ 77. I join the majority in concluding that the no knock entry was deficient because neither the affidavit nor the circumstances at the time of entry supply particularized facts to support a finding of reasonable suspicion that knocking and announcing would be dangerous or futile. As Justice Prosser wrote in *State v. Ward*:

> Our law strongly favors searches conducted pursuant to a warrant. . . . The warrant process not only places a neutral and detached magistrate between

alternative argument, that there was no causal relationship between the no-knock entry and the evidence found.

[1] Aside from the present case and *State v. Kelsey C.R.*, 2001 WI 54, 243 Wis. 2d 422, 626 N.W.2d 777, I have been unable to locate any case in which the Wisconsin Supreme Court concluded that the officers had no reasonable suspicion to act. Moreover, in both *Kelsey* and the present case, the court has not suppressed the evidence. If the result of my search is in error, I am confident a reader will advise me.

government intrusion and the people but also obligates government officials to demonstrate to that magistrate a substantial basis for their proposed intrusive conduct. In this process, neutral oversight is pointless if the magistrate merely rubberstamps an affidavit based on generalizations instead of particulars.[2]

¶ 78. The majority opinion recognizes that "vague and somewhat outdated" information about prior arrests, lacking in detail, is not sufficient to support a finding of reasonable suspicion.[3] Likewise, the presence of "felony drug dealing and the officer's training and experience, cannot be relied upon without running afoul of *Richards v. Wisconsin*[4] and *Meyer*.[5] "[6]

¶ 79. My enthusiasm about the court's step forward in giving meaning to the Fourth Amendment's requirement of "reasonable suspicion" is immediately tempered, however, by the court's step backward in adopting a "*Leon*-plus" good faith exception, grounded in the Wisconsin Constitution, to Wisconsin's long-standing exclusionary rule.

¶ 80. I disagree with the adoption of this special good faith exception grounded in the Wisconsin Constitution for four reasons: (1) the majority opinion is

[2] *State v. Ward*, 2000 WI 3, 231 Wis. 2d 723, 768, 604 N.W.2d 517 (Prosser, J., dissenting).

[3] *See* majority op. at ¶ 26.

[4] *Richards v. Wisconsin*, 520 U.S. 385 (1997).

[5] *State v. Meyer*, 216 Wis. 2d 729, 576 N.W.2d 260 (1998).

[6] *See* majority op. at ¶ 26 (citations added). The majority is unwilling to rely on a ten-year-old out-of-state arrest to find reasonable suspicion that Clinton Bentley might resort to violence. *See* majority op. at ¶ 21. The majority also refused to rely on the arrest record of another occupant because the affidavit lacked any specifics about the time or place of the arrests. *See* majority op. at ¶ 22.

disingenuous in requiring the State to show "that the process used in obtaining the search warrant included a significant investigation and a review by either a police officer trained and knowledgeable in the requirements of probable cause and reasonable suspicion, or a knowledgeable government attorney";[7] (2) the exception betrays Wisconsin's long-standing commitment to excluding illegally seized evidence from use at trial; (3) the majority opinion's focus on deterring individual police misconduct mischaracterizes the nature of constitutional violations and ignores the role of magistrates, prosecutors, and judges, both trial and appellate, in protecting constitutional rights; and (4) the majority's cost-benefit analysis is inappropriate in the constitutional context and unpersuasive in its results.[8]

I

¶ 81. In an effort to sidestep the practical problems highlighted by commentators and the numerous other jurisdictions that have rejected the *Leon*[9] good faith exception, the majority opinion adopts a "*Leon*-plus" good faith test under Article I, Section 11 of the Wisconsin Constitution. The majority opinion imposes, along with the *Leon* requirement of good faith reliance on a facially valid warrant, the following two

---

[7] Majority op. at ¶ 3.

[8] The majority opinion concludes that the affidavit is "deficient only insofar as it fails to provide sufficiently particularized evidence to show that an unannounced entry would be dangerous or result in the destruction of evidence." *See* majority op. at ¶ 66. This "deficiency" is, of course, the basis for the constitutional violation that occurred in this case. *See* majority op. at ¶¶ 16–26.

[9] *United States v. Leon*, 468 U.S. 897 (1984).

269

requirements: (1) "significant investigation," and (2) "review by a police officer trained in, or very knowledgeable of, the legal vagaries of probable cause and reasonable suspicion, or [review by] a knowledgeable government attorney."[10] These checks on the *Leon* good faith exception were apparently derived from a law review article by Professor Dripps, who was critical of the reasoning in the *Leon* opinion.[11]

¶ 82. I agree with the majority opinion that the search and seizure provision of the Wisconsin Constitution, although substantially the same as the Fourth Amendment of the U.S. Constitution, can be interpreted as guaranteeing more protection to the people of the State of Wisconsin than the Fourth Amendment does.[12]

¶ 83. But what do these "*Leon*-plus" requirements mean? What constitutes "significant investigation" by a law enforcement officer? What standards does the court use to judge a law enforcement investigation? What training or knowledge meets the majority opinion's standard of "an officer trained in, or very knowledgeable of, the legal vagaries of probable cause and reasonable suspicion"? Who is a "knowledgeable government attorney"—every district attorney or assistant district attorney? A lawyer employed by the police department? A police officer who is a lawyer? Are attorneys deemed knowledgeable if they have law degrees or are members of the State Bar, or is more necessary? What is the knowledgeable officer or gov-

---

[10] Majority op. at ¶ 63.

[11] Donald Dripps, *Living With Leon*, 95 Yale L.J. 906, 932 (1986) ("Accordingly, in the absence of independent investigation and preapplication screening, the good faith exception should not apply.").

[12] *Compare* majority op. at ¶ 37 & n.12 *with* ¶¶ 60, 63.

ernment attorney reviewing? What kind of hearing must a circuit court judge conduct and what kind of record must be made to support the circuit court's decision that an officer or government attorney possesses these requirements and made the appropriate review?

¶ 84. The majority opinion does not address these concerns because the majority opinion is, I reluctantly conclude, disingenuous in setting forth its "*Leon*-plus" requirements. It is disingenuous because it fails to apply the "*Leon*-plus" good faith test that the newly invigorated Article I, Section 11 purportedly demands.

¶ 85. The majority opinion, without giving defense or prosecution counsel an opportunity to present evidence or make argument, concludes that the face of the affidavit in the present case, even though the officers researched only arrest records and not conviction records, reflects a significant investigation.

¶ 86. The majority opinion further finds that there was review by a knowledgeable police officer or government attorney. On what basis does the majority opinion make this finding? Who did the preapplication screening? When? How? Professor Dripps' discussion of internal preapplication screening refers to screening by a police superior or a government lawyer.

¶ 87. The majority opinion bases its finding of a requisite preapplication screening on inference from the record. The majority opinion finds that "[t]he warrant and affidavit reflect advanced legal training, beyond that given to a well-trained police officer," because "[t]he warrant and affidavit are replete with terms normally found in attorney-drafted documents including 'whereas,' 'curtilage,' 'to-wit,' and other such

271

similar terms."[13] This legalese touted by the majority opinion is often used by non-lawyers in an effort to sound like lawyers. Indeed, law students have been taught for at least the last 50 years to avoid this kind of legalese.

¶ 88. The majority opinion further infers that an attorney from the district attorney's office accompanied the police officer to the magistrate, even though the magistrate relied solely on an affidavit and took no testimony.[14]

¶ 89. The majority opinion ultimately concludes that the evidence should not be suppressed because the "*Leon*-plus" good faith exception the majority opinion adopts "was apparently followed."[15] Inference and "apparently" are good enough for the majority opinion.

¶ 90. To rely on an inference that the necessary "*Leon*-plus" state constitutional safeguards are apparently followed, in the same breath in which these state constitutional safeguards are set forth, is to render these state constitutional safeguards all but meaningless. If this court intends that these new state constitutional safeguards serve as a viable check on the warrant process, it should expound on these requirements and remand the case for further fact finding. Otherwise in every case a court can find by inference that these "*Leon*-plus" state constitutional safeguards were apparently followed.[16] What kind of test is this?

---

[13] Majority op. at ¶ 71.

[14] *See* majority op. at ¶ 72.

[15] Majority op. at ¶ 72.

[16] Even as it insists that these state constitutional requirements are viable safeguards, the majority leaves plenty of wiggle room to avoid enforcing these safeguards in the future as well. *See* majority op. at ¶ 72 n.36 ("Whether there has been significant investigation may depend on reasonable inferences

¶ 91. Moreover, Professor Dripps, the very source of the two safeguards adopted by the majority opinion, believes that these safeguards will not sufficiently protect Fourth Amendment rights.[17] The professor's more recent writings suggest the need for additional safeguards.[18] Indeed, Professor Dripps warns that "[t]he *Leon* regime, even now taking form in the lower courts, effects. . .systemic consequences, but

from the record. . . ."); *id.* ("[W]e expect that *usually* there will be testimony offered at the suppression hearing on such safeguards. . . .") (emphasis added).

[17] *See* Donald Dripps, *Living With Leon*, 95 Yale L.J. 906, 933–34 (1986) ("[B]y withdrawing the exclusionary sanction from an entire category of Fourth Amendment violations for which no other sanction is available, even in theory, the *Leon* majority has rendered 'the constitutional language that all warrants be issued only on a showing of probable cause. . .a nullity.' In effect, the Court maintains that searches pursuant to defective warrants violate the Fourth Amendment, but that nothing happens when such violations take place. This treats the amendment as a mere advisory norm rather than, as the supremacy clause commands, as the 'supreme Law of the Land.' For all practical purposes, a search unsupported by probable cause but pursuant to a facially valid warrant is now legal."); *see also* David Clark Esseks, *Errors in Good Faith: The Leon Exception Six Years Later*, 89 Mich. L. Rev. 625, 626 (1990) ("In an analysis of *Leon* defending its result, Professor Donald Dripps nevertheless criticized almost every line of Justice White's majority opinion.").

[18] Professor Dripps has recently proposed a more elaborate system in which the exclusionary rule is waived in return for government payment of a fixed amount of damages. *See* Donald Dripps, *The Case for the Contingent Exclusionary Rule*, 38 Am. Crim. L. Rev. 1 (2001).

at the cost of ceasing to speak honestly about the Constitution."[19]

## II

¶ 92. I now turn to my objections to adopting any version of the *Leon* good faith exception to the exclusionary rule. Most important, today's decision betrays Wisconsin's long-standing commitment to excluding illegally seized evidence from use at trial. As Justice Prosser has explained, the Wisconsin Supreme Court was one of the earliest state supreme courts in the nation to recognize the exclusionary rule. This state has a long history of treating the exclusionary rule as a substantive protection with constitutional, rather than judicial, underpinnings.[20] In my opinion, today's court should be more circumspect in scaling back the protections provided by our state constitution.[21] The majority's attempt to discredit decades of Wisconsin case law is not persuasive.[22]

## III

¶ 93. A third problem with the majority opinion is that *Leon* mischaracterizes the role of the exclusionary rule as focusing solely on the deterrence of police misconduct. This focus on deterring individual police misconduct minimizes the constitutional violation and ignores the role of magistrates, prosecutors, and judges, both trial and appellate, in protecting constitu-

[19] *See* Donald Dripps, *Living With Leon*, 95 Yale L.J. 906, 907–08 (1986).

[20] *See Orta v. Ruiz*, 2000 WI 4, 231 Wis. 2d 782, 786–791, 604 N.W.2d 543 (Prosser, J., concurring).

[21] *See Ward*, 231 Wis. 2d at 763 (Abrahamson, C.J., dissenting).

[22] *See* majority op. at ¶ 57 & n.25.

tional rights. In framing the exclusionary rule as a deterrent to police misconduct, the majority opinion appears to lay all blame for Fourth Amendment violations at the door of individual officers.[23] And in suggesting that absent police misconduct, there is no need to worry about the integrity of the rest of the system, the majority's analysis supplants this court's long-standing recognition that the exclusionary rule does not merely serve as a deterrent to police misconduct but rather promotes integrity in the entire process.[24] By focusing on police misconduct, the majority ignores the other institutional players who are

[23] *See* Wayne R. LaFave, *Search and Seizure* § 1.3(d) at 60–61 (3d ed. 1996) (describing *Leon*'s focus on deterring police misconduct as "a slick bit of burden-shifting" and suggesting that the good faith exception makes "some kind of comparative judgment of the malevolence level of judges generally versus police generally").

[24] *See State v. Whitrock*, 161 Wis. 2d 960, 988, 468 N.W.2d 696 (1991) ("The purpose of the rule is not just to deter unreasonable searches and to maintain judicial integrity, but also to assure all potential victims of unlawful government conduct—that the government would not profit from its lawless behavior, thus minimizing the risk of seriously undermining popular trust in government.") (citation and quotation omitted); *Conrad v. State*, 63 Wis. 2d 616, 635, 218 N.W.2d 252 (1974) ("The rationale of the exclusionary rule is twofold: (1). . .to deter unlawful or undesirable or unconstitutional police conduct, and (2) to insure some integrity in the judicial process by not having the judicial process sanction, approve and be party to constitutional violations or undesirable or unlawful police conduct in allowing evidence to be used notwithstanding the manner in which it was seized.") (citation and quotation omitted).

partners with law enforcement in protecting constitutional rights.[25]

¶ 94. I do not question the majority's conclusion that a good faith exception to the exclusionary rule does not alter officers' incentives to comply with the Fourth Amendment.[26] But what about the incentives for the other persons in the system? The majority is silent about the potential effects on issuing magistrates.[27] The majority is silent about the potential effects on prosecutors.[28] The majority is silent about the potential effects on public confidence in a justice

[25] *See* Silas Wasserstrom & William J. Mertens, *The Exclusionary Rule on the Scaffold: But Was It a Fair Trial?*, 22 Am. Crim. L. Rev. 85, 109 (1984) ("The more important issue. . .is not the deterrent effect of the exclusionary rule on the conduct of individual magistrates, but the extent to which the rule helps preserve the integrity of the warrant issuing process as a whole.").

[26] Other courts and commentators have questioned the effect of the good faith exception on officers, arguing that absent the deterrent device of the exclusionary rule, the police need not obtain a warrant that will pass muster upon review; rather, they need only obtain a warrant. *See, e.g., State v. Masala*, 579 A.2d 58, 67 (Conn. 1990); Silas Wasserstrom & William J. Mertens, *The Exclusionary Rule on the Scaffold: But Was It a Fair Trial?*, 22 Am. Crim. L. Rev. 85, 109 (1984).

[27] *See* Wayne R. LaFave, *Search and Seizure* § 1.3(d) at 60–61 (3d ed. 1996) (noting the empirical studies show a "substantial disparity between magistrates as to how much evidence is required to obtain a search warrant") (quoting L. Tiffany et al., *Detection of Crime* 204 (1967)).

[28] *See* Silas Wasserstrom & William J. Mertens, *The Exclusionary Rule on the Scaffold: But Was It a Fair Trial?*, 22 Am. Crim. L. Rev. 85, 114 (1984) (noting that the good faith exception in *Leon* likely affects the role of prosecutors who often review warrants in order to avoid suppression).

system that not only allows constitutional violations to go unaddressed, but also uses the fruits of those constitutional violations to convict those whose constitutional rights have been violated.[29] Our justice system can do better. Our justice system has done better in the seventy-seven years since the Wisconsin Supreme Court first recognized the exclusionary rule.[30]

¶ 95. The majority opinion is also silent about the potential effects on the judiciary and the ways in which the good faith exception to the exclusionary rule distorts Fourth Amendment jurisprudence.[31] Under the good faith exception, the focus in a suppression hearing shifts from an inquiry into whether the search was constitutional to an inquiry into whether the police officers acted in objectively reasonable reliance upon a search warrant. This shift risks stunting Fourth Amendment jurisprudence: Since there will be little likelihood of exclusion in marginal cases, courts will be less likely to consider the existence of probable cause or reasonable suspicion in these cases.[32] With the margi-

---

[29] *See Terry v. Ohio*, 392 U.S. 1 at 13 (1968) ("A ruling admitting evidence in a criminal trial, we recognize, has the necessary effect of legitimizing the conduct which produced the evidence, while the application of the exclusionary rule withholds the constitutional imprimatur.").

[30] *See Hoyer v. State*, 180 Wis. 407, 193 N.W. 89 (1923).

[31] *See* Donald Dripps, *Living With Leon*, 95 Yale L.J. 906, 940 (1986) ("[T]he availability of the good-faith exception depends on. . .how far short of the traditional probable cause showing [the warrant application] falls. In effect, all the Court's decision accomplishes is to reduce the degree of suspicion which a warrant application must establish to insulate a search from the exclusionary rule.").

[32] *See* Wayne R. LaFave, *Search and Seizure* § 1.3(d) at 63 n.37 (3d ed. 1996) (citing cases that reflect an appellate practice

nal cases removed from the mix, courts will be called upon to grant suppression motions only for the most flagrant constitutional violations. And, to recoin the familiar adage, bad facts make worse law.

## IV

¶ 96. A fourth weakness in the majority opinion is the majority's reliance on the *Leon* Court's cost-benefit analysis.[33] This cost-benefit analysis for Fourth Amendment violations has been roundly criticized by courts and commentators.[34] Even if a cost–benefit analysis were an appropriate basis for implementing

of skipping the constitutional question and only addressing the good faith reliance issue); *see also* Silas Wasserstrom & William J. Mertens, *The Exclusionary Rule on the Scaffold: But Was It a Fair Trial?*, 22 Am. Crim. L. Rev. 85 at 111–12 (1984) ("[I]t is unlikely that overburdened trial and appellate courts will take the time and effort to write advisory opinions on fourth amendment law when they can just as easily admit the evidence under the good faith exception.").

[33] *See* majority op. at ¶¶ 31, 58.

[34] *See, e.g.*, Wayne R. LaFave, *Search and Seizure* § 1.3(b) at 57–59 (3d ed. 1996) (describing *Leon*'s cost-benefit analysis as a "cockeyed characterization which heretofore had been found almost exclusively in the least sophisticated anti-exclusionary rule diatribes"); Donald Dripps, *Living with Leon*, 95 Yale L.J. 906, 939 (1986) (noting that the language of costs and benefits "cannot inform police or judges of their errors, for it implicitly denies that error has occurred").

*See also State v. Marsala*, 579 A.2d 58 at 65 (Conn. 1990) (in assessing costs, the majority in *Leon* erred in considering the aggregate costs of all exclusions, not just where police reasonably but mistakenly believed that their conduct was correct); *State v. Oakes*, 598 A.2d 119, 126 (Vt. 1991) ("There simply are insufficient empirical data for the costs and benefits of a good faith exception to be accurately assessed.").

the good faith exception, how does the court purport to quantify the cost of constitutional protections?[35] At present, few data support either side in the *Leon* debate, and empirical evidence on the question actually reveals that "the general level of the [exclusionary] rule's effects on criminal prosecutions is marginal at most."[36]

¶ 97. At any rate, viewing prosecutions that are lost due to an inability to use illegally seized evidence as a "cost" to be weighed against the "benefit" of constitutional protections seems contrary to the integrity of the Fourth Amendment.[37] The majority opinion posits that there is "no real benefit" to the exclusion of unlawfully seized evidence.[38] Such language dangerously underestimates the value of our federal and state constitutional protections. Excluding illegally seized evidence restores the parties to the position they would have been in without the constitutional violation. In restoring the status quo as it existed before the consti-

---

[35] *See State v. Guzman*, 842 P.2d 660, 673–674 (Idaho 1992) ("All of the rules which limit the admission of relevant evidence [privileges, etc.] including the exclusionary rule, exist to protect values which are difficult to quantify, yet which are considered important by society.").

[36] Wayne R. LaFave, *Search and Seizure* § 1.3(c) at 58 (3d ed. 1996) (quoting T. Davis, *A Hard Look at What We Know (and Still Need to Learn) About the 'Costs' of the Exclusionary Rule: The NIJ study and Other Studies of 'Lost' Arrests*, 1983 Am. B. Found. Res. J. 611, 622).

[37] *See* Donald Dripps, *Living With Leon*, 95 Yale L.J. 906, 939 (1986) ("The rhetoric of the *Leon* opinion describes such illegal searches as morally valuable. The loss of evidence would be a 'cost,' the actions of the police were 'objectively reasonable.' Language such as this cannot inform police or judges of their errors for it implicitly denies that error has occurred.").

[38] Majority op. at ¶ 58.

tutional violation, the exclusionary rule recognizes that lost prosecutions cannot be viewed as a legitimate cost, since the conviction would have been illegitimate from a constitutional standpoint.

¶ 98. For these reasons, numerous states have rejected the good faith exception to the exclusionary rule as a choice that would contradict the purpose of the exclusionary rule and their state constitution.[39] Indeed, as the majority opinion recognizes, more states have rejected the *Leon* rule than have embraced it.[40] Numerous additional states have declined to address whether their state constitution allows a good faith exception.[41] I believe that Wisconsin, too, must reject the exception.[42]

¶ 99. For the reasons set forth, I dissent.

¶ 100. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

---

[39] I use the data regarding other states' rejection of a good faith exception to the exclusionary rule for its persuasive value regarding the widely recognized shortcomings of *Leon*.

[40] *See* majority op. at ¶ 59. Eleven states, as well as the District of Columbia, have adopted a good faith exception under their state constitution through judicial opinion. Five states have adopted a good faith exception by statute. Fourteen states have rejected a good faith exception under their state constitution. Christopher Paul Fischer, Comment, *I Hear You Knocking, But You Can't Come In: The North Dakota Supreme Court Declines to Decide Whether the State Constitution Precludes a Good Faith Exception to the Exclusionary Rule, State v. Herrick, 1999 N.D. 1, 588 N.W.2d 846,* 76 N.D. L.Rev 123, 144–45 nn.201, 202, 203 (2000).

[41] *See id.* at 145 n.204.

[42] *See Ward,* 231 Wis. 2d at 761 (Abrahamson, C.J., dissenting).

¶ 101. DAVID T. PROSSER, J. *(dissenting)*. Hundreds of hours have been devoted to the legal issues in this relatively minor drug case, when a few minutes of good police work or careful magistrate inquiry could have prevented the problem. The court resolves the issues by burying almost 80 years of legal precedent to create a good faith exception to the exclusionary rule. Because the small gain that may come out of this sea change in our law does not outweigh the potential loss of liberty to our citizens, and because this case offers a feeble excuse to make such a far-reaching change, I respectfully dissent.

¶ 102. On April 27, 1998, Beloit Police Officer John Fahrney prepared an affidavit to support a search warrant at 802 Bluff Street, Apartment B, in the City of Beloit. His affidavit unquestionably presents probable cause to search the named premises, and the Beloit police did excellent work in gathering the evidence to establish probable cause.

¶ 103. However, Officer Fahrney wanted to dispense with the rule of announcement in executing the warrant. To secure judicial authority for this tactic, he was required to show a detached magistrate reasonable suspicion that an announcement would be dangerous, futile, or inhibit the investigation of the crime by allowing suspects to destroy evidence. *State v. Meyer*, 216 Wis. 2d 729, 734–35, 576 N.W.2d 260 (1998) (citing *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997)); *see State v. Orta*, 2000 WI 4, ¶¶ 17–20, 231 Wis. 2d 782, 604 N.W.2d 543 (Prosser, J., concurring). All members of the court conclude that he failed.

¶ 104. For me, the question of reasonable suspicion is very close. There is no question that Clinton Bentley was a drug dealer who sold cocaine, and he sold the cocaine out of Apartment B. Cocaine can be dis-

posed of more easily than marijuana, raising a concern about destruction of evidence. Moreover, Bentley was arrested for aggravated assault in Illinois in 1989 (nine years earlier), and he was arrested in Beloit in April 1998 (a few days earlier). All this is disturbing. Nevertheless, there is nothing in the affidavit that indicates why Clinton Bentley would attempt to destroy evidence more than any other cocaine dealer; and there is nothing in the affidavit that explains the disposition of the 1989 arrest or the nature of the 1998 arrest, and nothing that shows any criminal convictions between the 1989 and 1998 incidents. Proof of a conviction in 1989, violence in the intervening years, or possession of a firearm might have made this an easy case.

¶ 105. Shannon Eason was the other resident of Apartment B. She allegedly had been "arrested" for "such things as larceny (nine times), obstructing (three times), and ASSAULT (twice)." Again, however, the affidavit fails to state any particulars, including most significantly the dates, the places, and the disposition of these "arrests." There are no facts or circumstances given in connection with any of the incidents. It is risky for a court to draw inferences from incomplete information which might turn out to be compelling but also might prove to be meaningless.

¶ 106. If the officer had simply taken a few minutes to write an additional paragraph or two showing some relevant convictions or other circumstances that would provide reasonable suspicion that Shannon Eason or Clinton Bentley would present a danger to officers, his affidavit could have been approved, handily.

¶ 107. It is possible that Officer Fahrney knew exactly how many criminal convictions Bentley and Eason had. After all, his affidavit asserts that he

"checked Beloit police computer records." It is possible that the Beloit Police Department had ample information in its files to remove any doubt that Bentley and Eason could be dangerous. It is possible that Fahrney and Court Commissioner Meyer discussed paragraph 4 of the affidavit (listing arrests) before the Court Commissioner signed the warrant. It is possible that Commissioner Meyer was personally familiar with Bentley or Eason from experience in court and could have testified as much. It is possible that Commissioner Meyer turned to a computer to check the Circuit Court Automation Program (CCAP) and obtained evidence of some relevant convictions before he approved the warrant.

¶ 108. Our problem is that Officer Fahrney was never brought to a hearing to explain his knowledge, or to describe what happened when he interacted with the Court Commissioner at the time he obtained the warrant. There is no record of what Commissioner Meyer said, much less what he thought. There is no effort to bolster or supplement the warrant application. There is no evidence of any additional information available to officers before they executed the warrant. All we have is an inadequate affidavit.

¶ 109. The typed affidavit is dated April 27, 1998. The typed warrant is dated April 28, 1998. The warrant was signed by Commissioner Meyer at 2:51 p.m. on April 27, 1998—the day before the officer expected to obtain the warrant. If only someone had taken a little more time to perfect the affidavit.

¶ 110. We often draw on baseball analogies to explain American life. In baseball, a player who fails to touch all the bases is not permitted to score. In fact, the player is out. There is no good faith exception for failing

to touch third base. The officer and the magistrate should have touched third base.

¶ 111. Personal liberty is not a game. It is the hallmark of our country. Upholding the rule of law will not always produce a popular outcome, but it will preserve freedom. That is our duty as an independent judiciary.

¶ 112. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.