COURT OF APPEALS
DECISION
DATED AND FILED

April 16, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1142-CR**

Cir. Ct. No. 2019CF1050

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

DARIAZ LOUIS HIGGINS,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: JANET C. PROTASIEWICZ and J.D. WATTS, Judges. *Affirmed.*

Before Donald, P.J., Geenen and Colón, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   Dariaz Louis Higgins appeals from a judgment of conviction for one count of first-degree intentional homicide and one count of attempted first-degree intentional homicide, and an order of the circuit court denying his postconviction motion for plea withdrawal, without a hearing.[1]

¶2     On appeal, Higgins raises two main arguments that the circuit court (1) erroneously denied his motion to suppress and (2) erroneously denied his postconviction motion for plea withdrawal, without a hearing.   Regarding his motion to suppress, Higgins argues that the statements that he made to detectives in the days following his arrest were taken without the proper *Miranda*[2] warnings and in disregard of his invocation of his right to remain silent.   As to his postconviction motion for plea withdrawal, Higgins argues that he received ineffective assistance of counsel related to his decision to plead guilty and that trial counsel failed to properly inform him of the elements of the crimes to which he pled guilty.   For the reasons set forth below, we disagree and affirm.

## BACKGROUND

¶3     On March 12, 2019, Higgins was charged with one count of first-degree intentional homicide, with use of a dangerous weapon, for the shooting death of Sierra Robinson and one count of first-degree recklessly endangering

---

[1]  The Honorable Janet C. Protasiewicz accepted Higgins' pleas, entered the judgment of conviction, and presided over Higgins' sentencing.  The Honorable J.D. Watts entered the order denying Higgins' postconviction motion.  For ease of reference, we refer to both as the circuit court.

[2]  *Miranda v. Arizona*, 384 U.S. 436 (1966).

safety, with use of a dangerous weapon, for the shooting of L.P.[3]  In an amended criminal complaint filed on April 3, 2019, the State amended the charge related to L.P. to attempted first-degree intentional homicide and added a count of first-degree recklessly endangering safety for the shooting of R.B.

¶4     As established by the criminal complaint, Higgins was the former pimp for Robinson and L.P., and Higgins and Robinson had a child—N.R.—together.  Robinson moved to Las Vegas in February 2019 and left N.R. with Higgins.  Higgins subsequently agreed to give N.R. to Robinson, and so, Robinson returned to Milwaukee on March 9, 2019, to pick up N.R.  On March 11, 2019, Robinson and L.P. met Higgins, and Higgins told Robinson and L.P. that he would take them to N.R. later.  The three of them then drove around in Higgins' SUV, smoking and drinking.  Higgins also gave an ecstasy pill to Robinson and L.P. Eventually Higgins took Robinson and L.P. to an apartment building, and Higgins told Robinson and L.P. that N.R. was inside.  Robinson and L.P. exited the SUV and began walking to the apartment building.  Higgins shot Robinson and L.P. from behind as they were walking to the apartment building, and Higgins left in the SUV.

¶5     Robinson was pronounced dead at the scene, and L.P. was transported to the hospital for treatment of multiple gunshot wounds.  A stray bullet from the shooting also injured R.B. when it flew through the window of his apartment.

---

[3] We refer to the surviving victims and child in this matter using their initials.  *See* WIS. STAT. RULE 809.19(1)(g), 809.86 (2021-22).  All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

¶6    N.R.'s whereabouts following the shooting were unknown, and the police began searching for her. As part of that search, the police issued an Amber Alert immediately after the shootings on March 11, 2019, requesting the public's assistance in locating N.R. The alert indicated that N.R. was missing, that she was last seen with Higgins, and that N.R. was considered to be in danger. When Higgins was arrested on March 13, 2019, on the charges related to the shootings, N.R. remained missing, and the police effort to find N.R. continued. As one of the detective's later described, the case received "a lot of media coverage" and "[i]t was a national thing."

¶7    Multiple detectives spoke with Higgins in the days following his arrest because, as one of the detectives later testified, "[o]ur goal was to find the little girl," and locating her was "a priority" and considered "an exigent circumstance." However, when detectives spoke to Higgins to learn more about N.R.'s whereabouts, Higgins instead provided details about the shootings of both Robinson and L.P. In the end, N.R.'s body was found in a ditch in Minnesota, and it became clear that Higgins knew N.R. had been dead the entire time.[4] Higgins was not questioned any further by detectives about N.R.'s whereabouts after the discovery of N.R.'s body.[5]

¶8    Higgins subsequently filed a motion to suppress the statements that he provided to the detectives. He argued, as relevant to his appeal, that the

---

[4] As one of the detectives testified, the description of N.R.'s location that Higgins had been providing "later made sense when the baby was located" and "what [the police] didn't realize was where [Higgins] was telling [the police] wasn't where a house was but the general location of where this child was … thrown out on the side of the road."

[5] As noted by the parties during the proceedings, Higgins faced charges in Minnesota for the death of N.R. N.R. was two years old at the time of her death.

4

statements should be suppressed because they were taken in violation of his Fifth Amendment rights.[6] In particular, Higgins argued that he was not properly provided *Miranda* warnings and the detectives did not scrupulously honor the invocation of his right to remain silent when they continued to question him.

¶9 The circuit court held a hearing at which several of the detectives who participated in interviewing Higgins testified.[7] The first detective testified about the purpose of the interviews with Higgins, "Our goal, when we went in with Mr. Higgins, was for him to let us know where we could find the girl, because she was missing. So we wanted to locate her." The detective further testified that locating N.R. was "a priority, exigent" because "it was [their] belief that [N.R.] was still alive" and "that he had knowledge as to where she was at[.]"[8]

¶10 The testimony of the detectives further established that each interview typically began when detectives retrieved Higgins from his cell and took Higgins to an interview room, and each interview typically ended when Higgins

---

[6] Higgins made several additional arguments in his motion to suppress that he has not pursued on appeal. We, therefore, consider those arguments abandoned, and we do not address them further. *See* ***A.O. Smith Corp. v. Allstate Ins. Cos.***, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998) ("[A]n issue raised in the trial court, but not raised on appeal, is deemed abandoned.").

[7] We note that the defense additionally called an expert to testify regarding the questioning that occurred in this case. However, as the expert's testimony largely focused on coercive practices and the voluntariness of Higgins' statements, we do not discuss the expert's testimony further, and we instead focus on the testimony provided by the detectives.

[8] The police believed N.R. was still alive based on information Higgins initially provided at the time of his arrest. Higgins "had [them] believing the night before that she was with a lady up in a motel. He gave [them] partial names, partial information that [they] had to go look for. And then he had told [them] a street." He also told detectives at one point during questioning about N.R.'s location that "I can't do it right now," and "I've got to think right now." However, as previously noted, it became clear that, at the time Higgins made these statements, Higgins was aware that N.R. was dead.

indicated that he no longer wanted to speak with the detectives, at which time the detectives would return Higgins to his cell.

¶11    The testimony also established that Higgins told the detectives that he had not slept or eaten for days prior to his arrest and "[t]hat he had never been so tired and sleepy in his whole entire life." He further told detectives that he had been drinking heavily and he had been doing drugs in the days prior to his arrest. However, after being arrested and taken into custody, the detectives provided Higgins with cigarettes and food, and Higgins was also allowed periods of time where he would have been able to rest. Higgins was further allowed to make phone calls to family members, and during one of his interviews, he even spent "at least an hour" on the phone with his family.

¶12    More specifically as to the reason the detectives did not provide *Miranda* warnings during the first interview, Detective Rom testified that they told Higgins "when we were in the interrogation room that we did not want to talk to him about why he was arrested" and "[w]e wanted to find [N.R.], and that's what we wanted to talk to him about." She further explained that when Higgins expressed a willingness to talk, the detectives still did not provide *Miranda* warnings "because in my mind I was thinking he was going to tell me everything about [N.R.] and that we were going to find her, that we were going to actually be able to send people to go get her." However, once Higgins started talking about the shootings, the detectives stopped Higgins and provided *Miranda* warnings. After the detectives provided *Miranda* warnings, however, Higgins still continued to provide details of the shootings.

¶13    Detective Schroeder also testified about that same interview and stated that "my main concern and my sole purpose of being in that room with

[Higgins] that day was to locate this child. I didn't want to talk about anything other than that." Detective Schroeder continued that he and his partner were "off that day" and they were specifically "called in … to speak to Mr. Higgins in regards to locating a missing child, not about any murders." In fact, Detective Schroeder "didn't know what his charges were" and "for what he was there for actually at that time [he] had no idea."

¶14 Ultimately, the circuit court denied Higgins' motion to suppress. When the circuit court denied the motion to suppress, the circuit court began by observing:

> I think it's important for everybody to understand that this case is a little bit different than Mr. Higgins solely being questioned and interrogated about the death of [Robinson] and the shooting of [L.P.]
>
> All of this is being dealt with with a major backdrop of a child who's missing and the Milwaukee Police Department not knowing where that child is, not knowing what kind of, if any, danger that child is in and really putting the pedal to the metal to do everything that they can do to attempt to locate this child.
>
> ….
>
> But we have this massive search for this child going on during the time that Mr. Higgins is, in fact, being interviewed on numerous occasions by law enforcement.

The circuit court then continued to find that Higgins' statements were admissible.

¶15 In reaching its decision, the circuit court noted that it had watched all seven discs of the interviews in their entirety, and the circuit court emphasized the following excerpts. First, the circuit court stated that Higgins' arrest "put things into perspective" because Higgins originally gave the police "hope" that N.R. was alive and "had information bearing on her whereabouts" when, at the time of his

arrest, he "ask[ed] for his phone to give officers a number [of] the woman he claim[ed] [was] watching this child." Higgins then continued this hope because he told detectives during one of the later interviews that N.R. was alive but "he [wasn't] going to tell them where she [was]."

¶16     Second, the circuit court found additional "perspective" on the voluntariness of Higgins' statements by observing that Higgins did most of the talking without any prompting in the first interview and that, after his first admission, Higgins stated that he could not believe that "he did that shit; and it's over now." Then, during an admission in a subsequent interview, Higgins describes the shooting as "personal, but he feels relief" and "he feels good."

¶17     Higgins pled guilty on April 20, 2021, to one count of first-degree intentional homicide and one count of attempted first-degree intentional homicide. The count of first-degree recklessly endangering safety was dismissed and read in for sentencing purposes. Pursuant to the plea agreement, the State recommended a parole eligibility date of March 19, 2059, for the charge of first-degree intentional homicide and a consecutive sentence of ten years of initial confinement and ten years of extended supervision for the charge of attempted first-degree intentional homicide. Higgins also signed and submitted a Plea Questionnaire/Waiver of Rights form that included an addendum with the relevant jury instructions and his initials on the jury instructions. The circuit court conducted a plea colloquy and accepted Higgins' pleas.

¶18     As particularly relevant to this appeal, the circuit court had the following discussion with Higgins during the plea colloquy:

> THE COURT: And these jury instructions that your attorney provided me, they contain the elements the State would need to prove in order to convict you.

> Those elements are important because a jury would have to find that the State proved each and every element beyond a reasonable doubt before you could be convicted of either or both offenses. Do you understand that?
>
> THE DEFENDANT: Yeah.
>
> THE COURT: Did you carefully go over those elements with your attorney?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Do you have any questions about them?
>
> THE DEFENDANT: No.
>
> THE COURT: Do you fully understand them?
>
> THE DEFENDANT: Yeah.

The circuit court also addressed trial counsel saying, "Counsel, did you go over the plea questionnaire, the addendum form and the elements of these offenses with Mr. Higgins and explain them to him?" Trial counsel responded, "Yes."

¶19 Higgins was subsequently sentenced on July 26, 2021, to a term of life imprisonment with no eligibility for extended supervision on the count of first-degree intentional homicide and a consecutive sentence of twenty years of imprisonment, bifurcated as ten years of initial confinement and ten years of extended supervision on the count of attempted first-degree intentional homicide.

¶20 Higgins filed a postconviction motion in which he argued that he was entitled to plea withdrawal because he received ineffective assistance of counsel. In particular, Higgins alleged that he did not understand the elements of the crimes to which he pled guilty and that he entered a plea because trial counsel told him to. In response, the State argued that the record conclusively showed that Higgins understood the elements of the crimes to which he pled guilty, and the State offered the Plea Questionnaire/Waiver of Rights form that Higgins signed

and the plea colloquy conducted by the circuit court as evidence of Higgins' understanding of the elements of the crimes.

¶21    The circuit court denied Higgins' motion, without a hearing. In a written decision, the circuit court found that the record was "replete" with indications that Higgins understood the elements of the crimes to which he pled guilty and that Higgins' pleas were properly informed and understood. The circuit court further found that Higgins' allegations were "wholly insufficient" to establish prejudice and that Higgins' claim of coercion by trial counsel was conclusory. Thus, the circuit court denied Higgins' postconviction motion without a hearing.

¶22    Higgins now appeals.

## DISCUSSION

¶23    On appeal, Higgins argues that the circuit court erroneously denied his motion to suppress the statements he provided to the detectives and erroneously denied his postconviction motion for plea withdrawal without a hearing. We address each argument in turn.

### I.    Motion to Suppress

¶24    We review a circuit court's denial of a motion to suppress using a two-step framework. *State v. Eason*, 2001 WI 98, ¶9, 245 Wis. 2d 206, 629 N.W.2d 625. First, we review the circuit court's findings of fact and uphold them unless they are clearly erroneous. *Id.* Second, we review *de novo* the application of constitutional principles to those facts. *Id.*

¶25 In this case, Higgins argues that the circuit court erroneously denied his motion to suppress and that his statements to the detectives should have been suppressed for two main reasons: (1) the detectives failed to provide the appropriate *Miranda* warnings, specifically as it applies to the first time detectives spoke with Higgins, and (2) the detectives continued to speak with Higgins about his missing daughter after Higgins asserted his right to remain silent. In making this argument, Higgins contends that each time that detectives spoke with him, he faced the equivalent of a "legal custodial interrogation" that afforded him the Fifth Amendment protections at the heart of his argument.

¶26 "[T]he *Miranda* safeguards apply only to custodial interrogations[.]" *State v. Bartelt*, 2018 WI 16, ¶30, 379 Wis. 2d 588, 906 N.W.2d 684. "This procedural safeguard arose out of an understanding that custodial interrogations present a uniquely intimidating atmosphere that can interfere with a suspect's exercise of his rights[.]" *State v. Harris*, 2017 WI 31, ¶14, 374 Wis. 2d 271, 892 N.W.2d 663. Custodial interrogations "can take the form of either express questioning or its functional equivalent." *Id.*, ¶15.

¶27 Here, Higgins argues that the police questioning took the form of the functional equivalent of a custodial interrogation. The functional equivalent of a custodial interrogation is defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *State v. Hambly*, 2008 WI 10, ¶46, 307 Wis. 2d 98, 745 N.W.2d 48 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

¶28 Applying this definition to the police questioning that occurred in this case, we conclude that the circuit court properly denied Higgins' motion to

suppress because the statements that Higgins made during the first time he spoke with detectives were not made during the functional equivalent of a custodial interrogation. Rather, as the circuit court similarly observed, the detectives were interviewing Higgins in the context of a search for his missing two-year old daughter, N.R., during which Higgins instead volunteered information about the shootings of Robinson and L.P. "Volunteered statements of any kind are not barred by the Fifth Amendment[.]" *Innis*, 446 U.S. at 300 (citation omitted).

¶29 Importantly, Higgins did not face questioning in the first interview about the shootings for which he was arrested and charged, and Higgins provided information about the shootings without prompting from the detectives and without questioning on that topic. In fact, as the circuit court described the first of the interviews in which Higgins provided two of his incriminating statements that he seeks to suppress, Higgins "does almost all of the talking with little to no questions from the detective[s], nothing." Detectives Rom and Schroeder who conducted the interview also testified that they specifically told Higgins that they only wanted to talk about Higgins' missing daughter and that they were not interested in anything to do with the reason for Higgins' arrest.

¶30 Consequently, when the detectives first took Higgins to the interview room to ask Higgins about the whereabouts of his missing two-year old daughter, N.R., and did not prompt Higgins to talk about the topic of the shootings of Robinson and L.P., we cannot conclude that the detectives should have known that their conduct was reasonably likely to elicit an incriminating response from Higgins about the two shootings. *See Hambly*, 307 Wis. 2d 98, ¶46; *see also Innis*, 446 U.S. at 301-02 ("[P]olice surely cannot be held accountable for the unforeseeable results of their words or actions[.]"). Accordingly, we reject Higgins' argument that the detectives failed to properly provide *Miranda*

warnings and his statements made in the first interview should have been suppressed.

¶31 Turning to the second part of Higgins' argument, we conclude that the detectives "scrupulously honored" Higgins' invocation of his right to remain silent, and therefore, the circuit court properly denied Higgins' motion to suppress the statements he provided in subsequent interviews with the detectives. *See Michigan v. Mosley*, 423 U.S. 96, 104 (1975).

¶32 The "critical safeguard" to a person's right to remain silent is "a person's 'right to cut off questioning.'" *Id.* at 103 (citation omitted). "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104 (citation omitted).

¶33 In *Mosley*, the Court found the following four factors significant in determining that the defendant's right to remain silent was scrupulously honored:

> (1) The original interrogation was promptly terminated. (2) The interrogation was resumed only after the passage of a significant period of time…. (3) The suspect was given complete *Miranda* warnings at the outset of the second interrogation. (4) A different officer resumed the questioning. (5) The second interrogation was limited to a crime that was not the subject of the earlier interrogation.

*State v. Hartwig*, 123 Wis. 2d 278, 284, 366 N.W.2d 866 (1985). This test, however, is not "woodenly" applied, and "[t]he essential issue is whether, under the circumstances, the defendant's right to silence was scrupulously honored." *Id.* at 285.

¶34 Considering the circumstances of this case, it is clear that the detectives scrupulously honored Higgins' invocation of his right to remain silent.

13

As the detectives testified, and the record plainly demonstrates, the detectives terminated any questioning when Higgins made it known that he no longer wished to speak to them. There was also a significant amount of time in between each period of questioning—in some instances six hours or more—and there was a different combination of detectives who spoke with Higgins in the interviews.

¶35 Significantly, and as we continue to emphasize, the questioning was focused on the whereabouts of N.R. and the frantic police effort to find her alive. The police did not question Higgins about the crimes for which he was arrested and charged and, therefore, had no reason to believe that the detailed statements Higgins gave in response to the questioning would relate to those crimes. In fact, detectives specifically indicated to Higgins that they did not want to speak to him about the events for which he was arrested. Thus, under these circumstances, we conclude that the police scrupulously honored any invocation of Higgins' right to remain silent when the questioning did not even focus on any known criminal activity on Higgins' part.

¶36 Higgins nevertheless argues that the detectives failed to scrupulously honor his right to remain silent because each round of questioning focused on the same topic—N.R.'s whereabouts. *See **Hartwig***, 123 Wis. 2d at 284 (listing the ***Mosley*** factors). We disagree that the continued focus on N.R.'s whereabouts requires a finding that the detectives failed to scrupulously honor Higgins' invocation of his right to remain silent. *See **State v. Bean***, 2011 WI App 129, ¶¶30-32, 337 Wis. 2d 406, 804 N.W.2d 696.

¶37    Accordingly, we conclude that the circuit court did not err when it denied Higgins' motion to suppress the statements that he made to the detectives in the days following his arrest.[9]

## II.    Plea Withdrawal

¶38    Higgins argues that he is entitled to plea withdrawal because he received ineffective assistance of counsel.  In essence, Higgins argues that his decision to plead guilty was made in haste without proper discussion with trial counsel, and he specifically contends that he made the decision to plead guilty just minutes prior to entering his guilty pleas and with only minutes to discuss the decision with trial counsel in the courtroom prior to entering his guilty pleas.  He further contends that, as a result of this haste, trial counsel did not properly review the elements of the crimes with him and he consequently failed to understand the elements of the crimes to which he was pleading guilty.

¶39    By contrast, the State argues that the record conclusively demonstrates that Higgins is not entitled to relief.  The State emphasizes that the circuit court established during the plea colloquy that trial counsel reviewed the elements of the crimes with Higgins and Higgins understood those elements.  The State also contends that the Plea Questionnaire/Waiver of Rights form further demonstrates that Higgins understood the elements of the crimes to which he pled guilty.  Accordingly, the State argues that the record conclusively shows that Higgins understood the elements of the crimes to which he pled guilty.

---

[9] The State additionally argues that any error in denying the motion to suppress is harmless.  As a result of our conclusion today, we need not reach the State's argument.  *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) ("[C]ases should be decided on the narrowest possible ground[.]").

15

¶40     The State further argues that Higgins' allegations are conclusory. In this regard, the State asserts that Higgins failed to properly allege that he would not have pled guilty if he had more time to discuss the decision to plead with trial counsel or if trial counsel had reviewed the elements of the crimes with Higgins differently. To the extent that Higgins argues that trial counsel coerced Higgins to plead guilty, the State additionally points to *State v. Rhodes*, 2008 WI App 32, ¶11, 307 Wis. 2d 350, 746 N.W.2d 599, and argues that trial counsel has the ability to strongly advise a client to enter a plea.

¶41     In short, we agree with the State, and we conclude that the record conclusively shows that Higgins is not entitled to relief and Higgins' allegations for plea withdrawal are conclusory. *See State v. Allen*, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433. Therefore, the circuit court properly exercised its discretion when it denied Higgins' motion for postconviction relief without a hearing. *See id.*

¶42     "To withdraw a guilty plea after sentencing, a defendant must show by clear and convincing evidence that a refusal to allow withdrawal of the plea would result in manifest injustice[.]" *State v. Dillard*, 2014 WI 123, ¶36, 358 Wis. 2d 543, 859 N.W.2d 44. "One way to demonstrate manifest injustice is to establish that the defendant received ineffective assistance of counsel." *Id.*, ¶84.

¶43     To demonstrate ineffective assistance of counsel, the defendant must prove two elements: (1) trial counsel performed deficiently and (2) trial counsel's deficient performance prejudiced the defendant. *Id.*, ¶85. In order to demonstrate prejudice in the context of a claim of ineffective assistance for plea withdrawal, "the defendant must show that there is a reasonable probability that, but for

16

counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *See* ***Hill v. Lockhart***, 474 U.S. 52, 58-59 (1985).

¶44    During our review, we uphold the circuit court's findings of historical fact unless clearly erroneous, and we determine independently whether Higgins is entitled to plea withdrawal based on those facts. *See* ***Dillard***, 358 Wis. 2d 543, ¶38.

¶45    A thorough review of the record demonstrates that Higgins is not entitled to a hearing on his plea withdrawal claim. The circuit court conducted a plea colloquy with Higgins in which Higgins established that he "carefully" reviewed the elements of the crimes to which he pled guilty with trial counsel, he understood them, and he did not have "any questions" about them. Trial counsel further confirmed that he reviewed the elements of the crimes with Higgins prior to Higgins' guilty pleas. The record also demonstrates that, with trial counsel's assistance, Higgins reviewed and completed a Plea Questionnaire/Waiver of Rights form, with an addendum containing the relevant jury instructions, prior to entering his guilty pleas.

¶46    In the face of this record, which is "replete with indications" that Higgins understood the elements of the crimes to which he pled guilty and trial counsel reviewed the elements of the crimes with Higgins, Higgins' allegations for plea withdrawal as a result of having received ineffective assistance of counsel fall short. *See* ***State v. Sulla***, 2016 WI 46, ¶¶43-48, 369 Wis. 2d 225, 880 N.W.2d 659.

¶47    Moreover, in the context of a claim of plea withdrawal based on ineffective assistance of counsel, Higgins is required to demonstrate why he would have forgone entering guilty pleas and instead have insisted on going to trial. *See*

*Hill*, 474 U.S. at 58-59. However, on this point, Higgins merely asserts that he had maintained a trial posture until he entered his guilty pleas, with nothing more. Conspicuously absent are any allegations that he would have maintained a trial posture if trial counsel had reviewed the elements of the crimes with Higgins in a different manner or generally why Higgins would have insisted on proceeding to trial if the events leading up to his guilty pleas had proceeded differently. As the circuit court stated, these allegations are "wholly insufficient" to establish prejudice and warrant a hearing on Higgins' claim for plea withdrawal.

¶48 Therefore, we conclude that the circuit court did not erroneously deny Higgins' postconviction motion for plea withdrawal without a hearing.[10]

**CONCLUSION**

¶49 Upon review, we conclude that the circuit court properly denied Higgins' motion to suppress the statements about the shootings of Robinson and L.P. that he made to detectives following his arrest, and we further conclude that the circuit court properly denied Higgins' postconviction motion for plea withdrawal without a hearing. Accordingly, we affirm.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[10] To the extent that Higgins raises a claim under *State v. Bangert*, 131 Wis. 2d 246, 389 N.W.2d 12 (1986), that the circuit court failed to properly inform Higgins during the plea colloquy of the elements of the crimes to which Higgins pled guilty, we consider the argument undeveloped, and we do not address it further. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

18